## Page 1

(1)
(2) UNITED STATES DISTRICT COURT
(3) EASTERN DISTRICT OF NEW YORK
(4) ------------------------------------x
(5) ANJELL BOWERS, :
(6) Plaintiff, : Case No.
(7) -against- : 09 CV 4096
(8) AFRICAN AMERICAN PLANNING :
(9) COMMISSION, INC. and :
(10) MATTHEW OKEBIYI, :
(11) Defendants. :
(12) ------------------------------------x
(13) April 9, 2010
(14) 10:00 a.m.
(15)
(16)   Deposition of MATTHEW OKEBIYI, held at the
(17) Law offices of Jared Lefkowitz, 250 Park Avenue,
(18) New York, New York, before Susan B. Ratner, a
(19) Shorthand Reporter and Notary Public within and for
(20) the State of New York.
(21)
(22)
(23)
(24)
(25)

## Page 2

(1)
(2) A P P E A R A N C E S :
(3)
(4) LAW OFFICES OF JARED LEFKOWITZ
(5) Attorneys for Plaintiff
(6)   250 Park Avenue
(7)   New York, New York 10177
(8) BY: JARED LEFKOWITZ, ESQ.
(9)
(10) SEYFARTH SHAW LLP
(11) Attorneys for Defendants
(12)   620 Eighth Avenue
(13)   New York, New York 10018-1405
(14) BY: ROBERT WHITMAN, ESQ.
(15)
(16)   ALSO PRESENT:
(17) PAMELA M. JUNIOR, AAPCI Board Chair
(18) MAGALIE OCCEAN, AAPCI Board Member
(19)
(20)
(21)
(22)
(23)
(24)
(25)

## Page 3

(1)
(2) IT IS HEREBY STIPULATED AND AGREED, by and
(3) between the attorneys for the respective parties
(4) herein, that filing and sealing be and the same are
(5) hereby waived.
(6) IT IS FURTHER STIPULATED AND AGREED
(7) that all objections, except as to the form of the
(8) question, shall be reserved to the time
(9) of the trial.
(10) IT IS FURTHER STIPULATED AND AGREED that the
(11) within deposition may be signed and sworn to before
(12) any officer authorized to administer an oath, with
(13) the same force and effect as if signed and sworn to
(14) before the officer before whom the within deposition
(15) was taken.
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

## Page 4

(1)
(2) M A T T H E W O K E B I Y I,
(3) called as a witness, having been first duly
(4) sworn by the Notary Public (Susan B. Ratner),
(5) stating his business address as AAPCI,
(6) P.O. Box 330-707, Brooklyn, New York 11233,
(7) was examined and testified as follows:
(8) EXAMINATION BY
(9)   MR. LEFKOWITZ:
(10) Q.   Would you state your name and address for
(11) the record, please.
(12) A.   Matthew Okebiyi, O-k-e-b-i-y-i.
(13) My name and address?
(14) Q.   Yes.
(15) A.   P.O. Box 330-707, Brooklyn, New York
(16) 11233.
(17) Q.   That P.O. box address that you just gave,
(18) is that the P.O. box address for the African American
(19) Planning Commission, Inc.?
(20) A.   Correct.
(21) Q.   What is your date of birth?
(22) A.   4/1/62.
(23) Q.   Where were you born?
(24) A.   Lagos, Nigeria.
(25) Q.   How long have you been in the

|  | Page 5 |
|---|---|

(1)
(2)   United States?
(3)     A.   I don't recall.
(4)     Q.   Are you a citizen of the United States
(5)   or –
(6)     A.   Yes.
(7)     Q.   Yes?
(8)     A.   Yes, I am.
(9)     Q.   When did you become a citizen of the
(10)  United States?
(11)    A.   I don't recall what year, how long ago.
(12)    Q.   Is it more than ten years ago?
(13)    A.   Yes.
(14)    Q.   More than 15 years ago?
(15)    A.   I don't recall.
(16)    Q.   Is it your best recollection that you
(17)  became a citizen between ten and 15 years ago?
(18)    A.   It's possible.
(19)    Q.   What immigration status did you have in
(20)  the United States before becoming a United States
(21)  citizen?
(22)    A.   I came here on a student visa.
(23)    Q.   In what year?
(24)    A.   I don't recall.
(25)    Q.   Where were you a student?

|  | Page 6 |
|---|---|

(1)
(2)     A.   St. Francis College.
(3)     Q.   Is it fair to say that you were
(4)  approximately 18 years old when you came to the
(5)  United States first?
(6)    A.   Approximately.
(7)    Q.   When you started at St. Francis College,
(8)  was it your first year of college, or were you in one
(9)  of your later years of college?
(10)    A.   I don't understand the question.
(11)    Q.   Fair enough.
(12)  Were you an undergraduate student or a
(13)  graduate student when you went to St. Francis?
(14)    A.   Undergraduate.
(15)    Q.   Were you a freshman or some other year
(16)  when you started at St. Francis?
(17)    A.   A freshman.
(18)    Q.   Just for the sake of the record, I notice
(19)  that you have, if any, a very slight accent.
(20)  Am I correct that you speak, read, write,
(21)  and understand English fluently?
(22)    A.   Yes.
(23)    Q.   What is your Social Security number?
(24)    MR. WHITMAN:   I will object.
(25)  There is no reason for that.

|  | Page 7 |
|---|---|

(1)
(2)   I don't see any reason why he should
(3)  have to reveal that.
(4)    MR. LEFKOWITZ:   If I want to conduct
(5)  an investigation and look into it, but that
(6)  is not even a valid objection at a deposition.
(7)    (Confidential pages redacted and found
(8)  under separate cover.)
(9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

|  | Page 8 |
|---|---|

(1)
(2)   ** CONFIDENTIAL PORTION **
(3)   UNITED STATES DISTRICT COURT
(4)   EASTERN DISTRICT OF NEW YORK
(5)   -------------------------------------x
(6)   ANJELL BOWERS, :
(7)   Plaintiff, : Case No.
(8)   -against- : 09 CV 4096
(9)   AFRICAN AMERICAN PLANNING :
(10)  COMMISSION, INC. and :
(11)  MATTHEW OKEBIYI, :
(12)  Defendants. :
(13)  -------------------------------------x
(14)  April 9, 2010
(15)
(16)   Confidential portion from the deposition of
(17)  MATTHEW OKEBIYI
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

## Page 9

(1)   M. Okebiyi - Confidential

(2)   BY MR. LEFKOWITZ:

(3)   Q.   What is your Social Security number, sir?

(4)   MR. WHITMAN:   I will designate it as

(5) confidential.

(6) You can go ahead and answer.

(7)   A.   ████████████

(8)   MR. LEFKOWITZ:   I object to the

(9) designation as confidential.

(10)   (Continued in Non-Confidential

(11) Transcript.)

(12)

(13)

(14)

(15)

(16)

(17)

(18)

(19)

(20)

(21)

(22)

(23)

(24)

(25)

## Page 10

(1)

(2)   BY MR. LEFKOWITZ:

(3)   Q.   Are you married?

(4)   A.   No.

(5)   Q.   Have you ever been married?

(6)   A.   Yes.

(7)   Q.   How many times have you been married?

(8)   A.   Once.

(9)   Q.   When did you get married?

(10)   A.   I don't recall when.

(11)   Q.   Where did you get married?

(12)   A.   Mount Vernon, New York.

(13)   Q.   Would that be after you came to the

(14) United States on a student visa?

(15)   A.   No.

(16) That was two years later.

(17)   Q.   It was still afterwards, though, still

(18) after you came to New York on a student visa?

(19)   A.   Yes.

(20)   Q.   You are no longer married?

(21)   A.   Correct.

(22)   Q.   How did that marriage end?

(23)   MR. WHITMAN:   Technically?

(24)   Q.   Did it end in divorce or some other –

(25)   A.   Divorce.

## Page 11

(1)

(2)   MR. LEFKOWITZ:   I did not want to ask

(3) whether his wife passed away.

(4)   MR. WHITMAN:   All right.

(5)   Q.   When did you get divorced?

(6)   A.   Approximately – I don't want to guess

(7) the year. I don't recall it.

(8)   Q.   Was it more than one year ago?

(9)   A.   Yes.

(10)   Q.   Was it more than five years ago?

(11)   A.   Around there.

(12) I don't want to guess at the date.

(13)   Q.   In what state were the divorce

(14) proceedings?

(15)   A.   New York State.

(16)   Q.   What was you wife's name?

(17)   A.   Simone.

(18)   Q.   Would you spell that, please.

(19)   A.   S-i-m-o-n-e.

(20)   Q.   And her last name?

(21)   A.   Nixon.

(22)   Q.   Spell that, please.

(23)   A.   N-i-x-o-n.

(24)   Q.   Are you aware of where your ex-wife lives

(25) presently?

## Page 12

(1)

(2)   A.   Yes.

(3)   Q.   Where does she live?

(4)   A.   The Bronx.

(5)   Q.   Does she use that same name or some other

(6) name?

(7)   A.   What same name?

(8)   Q.   The name that you just gave, Simone

(9) Nixon, is that the name that she had when you were

(10) married?

(11)   A.   She uses Nixon. I believe she uses

(12) Nixon.

(13)   Q.   When you got married, did she take your

(14) surname?

(15)   A.   Yes.

(16)   Q.   Did she keep your surname after the

(17) divorce, or did she go back to her birth name?

(18)   A.   I believe she went back to her birth

(19) name.

(20)   Q.   Other than the last names of Nixon or

(21) Okebiyi, are you aware of any other surnames that she

(22) would have gone by?

(23)   A.   No.

(24)   Q.   Are you aware of whether your ex-wife

(25) remarried?

## Page 13

(1)
(2)   A.   No.
(3)   Q.   Do you have any children?
(4)   A.   No.
(5)   Q.   Do you currently live with anybody?
(6)   A.   No.
(7)   Q.   Have you ever lived with anybody, other
(8) than your wife, as an adult?
(9) Let me just focus the question.
(10)   A.   Please.
(11)   Q.   Since you came to the United States and
(12) began college at St. Francis, have you ever lived
(13) with anybody other than your wife?
(14)   MR. WHITMAN:   Are you asking about like
(15) a college roommate, something like that?
(16)   MR. LEFKOWITZ:   I will get into the
(17) details if he says yes.
(18) If he says no, I don't have to get
(19) into any details.
(20)   Q.   Have you ever lived with anybody?
(21)   A.   No.
(22)   Q.   Like your attorney suggested, when you
(23) were in college, you did not have a college roommate
(24) or anything like that, you lived alone when you were
(25) in college?

## Page 14

(1)
(2)   A.   Brothers.
(3)   Q.   That is who I was talking about.
(4) When you went to college, you lived with
(5) your brothers?
(6)   A.   Yes.
(7)   Q.   How many brothers do you have?
(8)   A.   One older and two younger.
(9)   Q.   What is your older brother's name?
(10)   A.   Solomon.
(11)   Q.   What are your two younger brothers'
(12) names?
(13)   A.   Raymond and Michael.
(14)   Q.   Are your brothers also citizens of the
(15) United States?
(16)   A.   Yes, they are.
(17)   Q.   Did they become citizens at or around the
(18) same time that you did?
(19)   A.   I don't recall.
(20)   Q.   Where does Solomon live now?
(21)   A.   In Brooklyn, New York.
(22)   Q.   Where does he work?
(23)   A.   I don't know.
(24)   Q.   Are you in touch with him?
(25)   A.   No.

## Page 15

(1)
(2)   Q.   Are you estranged from him?
(3)   A.   We have not spoken in several years.
(4)   Q.   Why is that?
(5)   MR. WHITMAN:   Objection.
(6)   Q.   You can answer.
(7)   MR. WHITMAN:   No, he can't answer.
(8) I would like an explanation of the
(9) purpose for the prying personal nature of
(10) these questions. I don't see how it's
(11) conceivably relevant, his relationship with
(12) his brother.
(13)   MR. LEFKOWITZ:   You are not entitled
(14) to it.
(15)   MR. WHITMAN:   I am not entitled to it?
(16)   MR. LEFKOWITZ:   An explanation.
(17)   MR. WHITMAN:   Counsel, I am not entitled
(18) to an explanation?
(19)   MR. LEFKOWITZ:   No.
(20) This is a deposition –
(21) DI MR. WHITMAN: I will instruct the witness
(22) not to answer.
(23) The grounds for the instruction are
(24) the harassing, overly personal nature of the
(25) questions.

## Page 16

(1)
(2)   MR. LEFKOWITZ:   Sir, this is a
(3) harassment lawsuit.
(4) Who he is and his relationships with
(5) people and how he treats people is entirely
(6) relevant.
(7) You are not even entitled to have me
(8) give this explanation, as you very well
(9) know, in a deposition.
(10) You can reserve your objections and
(11) you can go to the court and move to strike
(12) at some point, but you are not entitled to
(13) direct the witness not to answer, as you
(14) very well know.
(15)   MR. WHITMAN:   I disagree, counsel, and
(16) my instruction stands.
(17) If you would like a ruling from the
(18) court, you are entitled to seek it.
(19) I think at a minimum I am entitled to
(20) an explanation of the basis for the line of
(21) questioning.
(22)   MR. LEFKOWITZ:   I told you.
(23)   MR. WHITMAN:   You are within your
(24) rights not to give it to me, if that is your
(25) choice.

## Page 17

(1)
(2)     MR. LEFKOWITZ:    I just told you a
(3) moment ago, sir.
(4) I told you that this entire lawsuit is
(5) about harassment. It is about how he treats
(6) people.
(7) It is very relevant that now I have
(8) found out that he is not even on good terms
(9) with his brother.
(10) It's entirely relevant. It's
(11) something that I can go into.
(12) Maybe he is going to tell me that he
(13) doesn't get along with his brother because
(14) his brother found out that he was harassing
(15) people at work.
(16)     MR. WHITMAN:    Counsel, the lawsuit is
(17) about alleged harassment of one employee.
(18) RL MR. LEFKOWITZ: We don't need to go into
(19) this anymore.
(20) You have given the witness a direction
(21) not to answer. It's an improper direction.
(22) I will get a ruling.
(23)     Q.     Where does Raymond live?
(24)     A.     Queens, New York.
(25)     Q.     What does he do for a living?

## Page 18

(1)
(2)     A.     He is an accountant.
(3)     Q.     Where does he work?
(4)     A.     At AAPCI.
(5)     Q.     How long has he worked there?
(6)     A.     I don't recall.
(7)     Q.     Has he worked there since the inception
(8) of the company?
(9)     A.     I don't recall.
(10)     Q.     Your other brother, Michael, where does
(11) he live?
(12)     A.     In Brooklyn.
(13)     Q.     What does he do?
(14)     A.     He is a businessman.
(15)     Q.     Where does he work?
(16)     A.     He has a business outside of the
(17) United States.
(18)     Q.     What type of business?
(19)     A.     I don't recall.
(20)     Q.     When is the last time you spoke with him?
(21)     A.     I would say probably last week.
(22)     Q.     How frequently do you speak with him?
(23)     A.     As often as necessary.
(24) MO MR. LEFKOWITZ: I object and move to
(25) strike.

## Page 19

(1)
(2)     Q.     How often do you speak with him?
(3) Would you say that you speak with him as
(4) often as once a week or more often than that?
(5)     MR. WHITMAN:    I will just state for the
(6) record an opposition – if that is the right
(7) word – to the objection and the motion to
(8) strike as stated by counsel.
(9)     MR. LEFKOWITZ:    Knock yourself out.
(10)     MR. WHITMAN:    Counsel, if you could
(11) refrain from the sarcasm, I think that this
(12) day will go a lot more smoothly.
(13)     MR. LEFKOWITZ:    If you could refrain
(14) from the improper objections and directions
(15) not to answer, this would go more smoothly,
(16) too.
(17)     Q.     Do you speak with him once a week or
(18) more often than that?
(19)     MR. WHITMAN:    Objection.
(20)     Q.     You can answer.
(21)     A.     Probably at least once a week.
(22)     Q.     How old are you?
(23)     A.     I am 48.
(24)     Q.     How old is he?
(25)     A.     Who?

## Page 20

(1)
(2)     Q.     Michael.
(3)     A.     He is 46.
(4)     Q.     How often would you say that you have
(5) spoken with him once a week; would you say for your
(6) entire life or some shorter period than that?
(7)     MR. WHITMAN:    Objection to the form.
(8)     MR. LEFKOWITZ:    You are right. That is
(9) a bad question.
(10)     Q.     My question is, if you speak with your
(11) brother once a week, how do you not know what he does
(12) for a living and where he works?
(13)     MR. WHITMAN:    Objection to the form.
(14) That is not what he said.
(15)     Q.     What is your brother's business?
(16)     A.     My brother has a business in Europe. He
(17) does different things.
(18)     Q.     What different things?
(19)     A.     He is trying to develop a business.
(20)     Q.     A business doing what?
(21)     A.     I don't ask him.
(22)     Q.     You said that you went to St. Francis
(23) College?
(24)     A.     That is correct.
(25)     Q.     Is that in Brooklyn?

Page 21

(1)
(2)     A.     That is correct.
(3)     Q.     What year did you graduate?
(4)     A.     I don't recall.
(5)     Q.     You don't recall what year you graduated
(6) from college?
(7)     A.     No.
(8)     Q.     Is there a system of high school in
(9) Nigeria the same way that there is in the
(10) United States?
(11)     A.     We don't call it high school.
(12)     Q.     I guess that is what I am asking.
(13) What do you call it and how does it work?
(14)     MR. WHITMAN:     Objection to the form.
(15)     A.     It's called secondary school.
(16)     Q.     At what age does a person in Nigeria
(17) graduate or advance out of secondary school?
(18)     A.     I have no clue.
(19)     Q.     Did you go to secondary school in
(20) Nigeria?
(21)     A.     Part of it.
(22)     Q.     Where was the other part?
(23)     A.     In England.
(24)     Q.     Which was first, your secondary school in
(25) Nigeria, or the part when you went to school in

Page 22

(1)
(2) England?
(3)     A.     In Nigeria.
(4)     Q.     What year did you stop going to school in
(5) Nigeria and go to England?
(6)     A.     I don't remember.
(7)     Q.     How old were you at the time?
(8)     A.     I don't remember.
(9)     Q.     Were you a teenager?
(10)     A.     It's possible. I don't remember.
(11)     Q.     Are you saying that it's possible that
(12) you were ten years old when you left secondary school
(13) in Nigeria and went to England?
(14)     MR. WHITMAN:     Objection to the form.
(15)     A.     It's possible.
(16)     Q.     It's possible that you were ten years
(17) old?
(18)     A.     I don't remember.
(19)     Q.     Where did you go to school in England?
(20)     A.     I went to Whitefield Secondary School.
(21)     Q.     Where is that in England?
(22)     A.     It is in London.
(23)     Q.     What occasioned your going to school in
(24) England; did your family move there?
(25)     A.     Yes.

Page 23

(1)
(2)     Q.     Who moved there with you, what family
(3) members?
(4)     A.     My parents and my brothers.
(5)     Q.     Do you have any siblings other than the
(6) three brothers that you mentioned?
(7)     A.     No.
(8)     Q.     How long did you go to Whitefield
(9) Secondary School?
(10)     A.     I don't remember. It's so many years
(11) ago.
(12)     Q.     Was it more than two years?
(13)     A.     I don't remember, sir. It's so many
(14) years ago.
(15)     Q.     Did you graduate from Whitefield
(16) Secondary School?
(17)     A.     Yes.
(18)     Q.     Is there some sort of a specialty or
(19) degree that Whitefield gave you?
(20)     A.     Most probably.
(21)     Q.     What was it that you earned?
(22)     A.     Whitefield Secondary School, unlike
(23) America, is a high school, even though it's called
(24) secondary school. That means a high school diploma.
(25)     Q.     My question to you was whether there was

Page 24

(1)
(2) some kind of specialty or degree that was awarded to
(3) you and you said most probably.
(4) I am asking what it was.
(5) Is there some kind of specialty or is it
(6) just a general diploma?
(7)     A.     I don't remember.
(8)     Q.     After Whitefield Secondary School, was
(9) St. Francis College the next educational institution
(10) that you attended?
(11)     A.     No.
(12)     Q.     Where did you go after Whitefield
(13) Secondary School?
(14)     A.     St. George's College.
(15)     Q.     Where is that?
(16)     A.     In Weybridge, Sussex.
(17)     Q.     How long a gap was there between your
(18) leaving Whitefield Secondary School and your going to
(19) this college?
(20)     A.     I don't know.
(21)     Q.     Was it more than a year?
(22)     A.     I don't know.
(23)     Q.     Was it more than five years?
(24)     A.     I don't know. I don't recall.
(25)     Q.     You don't recall whether there was more

Page 25

(1)
(2) than a five-year gap between the time that you
(3) graduated from secondary school and the time that you
(4) went to college?
(5)    A.    No.
(6)    Q.    How long did you spend at this college?
(7)    A.    At St. George's?
(8) I want to say, approximately, maybe two
(9) years.
(10)    Q.    Did you earn a degree from St. George's?
(11)    A.    I wouldn't call it a degree as known in
(12) America.
(13)    Q.    What was it?
(14)    A.    It's like a diploma.
(15)    Q.    Did you complete your course of study
(16) there?
(17)    A.    I would say yes.
(18)    Q.    What was your course of study at
(19) St. George's?
(20)    A.    A levels.
(21)    Q.    What does that mean?
(22)    A.    A levels translates to, in American
(23) education, approximately, maybe the first year of
(24) college in America.
(25)    Q.    Were you the approximately the same age

Page 26

(1)
(2) as the other students there in your courses, or were
(3) you older or younger than the other students there?
(4)    MR. WHITMAN:    Objection to the form.
(5)    A.    I don't understand the question.
(6)    Q.    How old were you when you went to
(7) St. George's?
(8)    A.    I don't remember.
(9)    Q.    With all of these questions I am just
(10) trying to get a fix on a time line here.
(11) I am trying to get a gauge on whether you
(12) were older than the other students at St. George's,
(13) or younger than the other students at St. George's,
(14) or around the same age, so that we can determine
(15) approximately how old you were at the time that you
(16) went there.
(17)    A.    I don't recall.
(18)    Q.    Would you say that you were about the
(19) same age as your contemporaries at St. George's?
(20)    A.    Yes.
(21)    Q.    After St. George's, what was the next
(22) educational institution that you attended?
(23)    A.    I believe it might have been St. Francis.
(24)    Q.    But you are not sure?
(25)    A.    No.

Page 27

(1)
(2)    Q.    How long a gap was there between the time
(3) that you left St. George's and the time that you went
(4) to St. Francis?
(5)    A.    I don't recall.
(6)    Q.    Was it more than a year?
(7)    A.    I don't recall.
(8)    Q.    Was it more than five years?
(9)    A.    I don't recall.
(10)    Q.    While you were in school in England, did
(11) you work?
(12)    A.    No.
(13)    Q.    While you were in college in St. Francis,
(14) did you work?
(15)    MR. WHITMAN:    You mean other than as a
(16) student?
(17)    MR. LEFKOWITZ:    Yes.
(18)    Q.    I am talking about employment.
(19)    A.    No.
(20)    Q.    Did you earn a degree from St. Francis?
(21)    A.    Yes.
(22)    Q.    What degree was that?
(23)    A.    A BA.
(24)    Q.    In what field?
(25)    A.    Communications.

Page 28

(1)
(2)    Q.    What year did you graduate from
(3) St. Francis?
(4)    MR. WHITMAN:    Objection; asked and
(5) answered.
(6)    Q.    You can answer it again.
(7)    A.    I don't recall.
(8)    Q.    Again, would you say that you were
(9) approximately the same age as your contemporaries
(10) when you graduated from St. Francis?
(11)    MR. WHITMAN:    Objection to the form.
(12)    Q.    You can answer.
(13)    A.    I guess so.
(14)    Q.    Do you recall thinking, "Gosh, I'm older
(15) than all of these people that I am graduating with,"
(16) or something to that effect?
(17)    A.    No.
(18)    Q.    Do you recall thinking, "Gosh, I am
(19) younger than all of these people that I am graduating
(20) with," or something to that effect?
(21)    A.    No.
(22)    Q.    During the time that you spent in
(23) England, were you arrested for any reason?
(24)    A.    No.
(25)    Q.    Have you ever been arrested in the

Page 29

(1)
(2) United States for any reason?
(3)     A. No.
(4)     Q. Were you ever arrested anywhere else for
(5) any reason?
(6)     A. No.
(7)     Q. Are you presently using any prescription
(8) medication?
(9)     MR. WHITMAN: I will object to the
(10) extent that it relates to any matter other
(11) than his ability to testify truthfully today.
(12)     MR. LEFKOWITZ: Again, that is just
(13) not a valid objection at a deposition.
(14) Your objection is noted. I will get a
(15) ruling.
(16) Are you directing the witness not to
(17) answer?
(18) DI MR. WHITMAN: I will direct him not to
(19) answer.
(20) I think that that is harassing and
(21) inappropriate.
(22) Again, I think that there is a fair
(23) line of questioning on that topic, but not
(24) as phrased.
(25) RL MR. LEFKOWITZ: Your objection is, as the

Page 30

(1)
(2) other one, completely beyond the bounds of
(3) the law, and I will get a ruling.
(4)     Q. Are you presently under the influence
(5) of any drug or substance which would affect your
(6) ability to recall events here today?
(7)     A. Q. Are you presently under the influence of
(8)     Q. Are you presently under the influence of
(9) any drug or substance which would affect your memory
(10) in general?
(11)     A. No.
(12)     Q. Are you currently under the influence of
(13) any drug or substance which would affect your state
(14) of mind at all?
(15)     MR. WHITMAN: I will object to the form.
(16) You can answer.
(17)     A. No.
(18)     Q. Before today, have you ever given a
(19) deposition?
(20)     A. I'm not sure if that is what it was, but
(21) it was – I think that maybe the legal term is called
(22) a deposition.
(23) Around 1991, 1992, I was in a car
(24) accident, and there were a couple of attorneys.
(25) That was it, I think.

Page 31

(1)
(2)     Q. There was a lawsuit involving a car
(3) accident?
(4)     A. With the New York City EMS.
(5) I had to give some statement. I don't
(6) know if that was a deposition.
(7)     Q. Were you sitting in a room with a court
(8) reporter taking down testimony, or was it some other
(9) thing?
(10)     A. I don't recall if there was a court
(11) reporter. Somebody asked me questions.
(12)     Q. Were you a party to that lawsuit, if it
(13) was a lawsuit?
(14)     MR. WHITMAN: Objection.
(15)     Q. If it was a lawsuit.
(16)     MR. WHITMAN: Go ahead.
(17)     Q. I am going to call it a lawsuit, for
(18) lack of a better term at this point, but I
(19) understand, to your recollection, it may not have
(20) been a lawsuit.
(21) Were you a party to the proceedings?
(22)     A. That is legal term. I don't understand.
(23)     Q. Were you suing somebody as a result of
(24) this car accident?
(25)     A. I wasn't suing. I just wanted to get the

Page 32

(1)
(2) car fixed.
(3) The questions were asked about the
(4) accident.
(5)     Q. Certainly nobody was suing you; is that
(6) your recollection?
(7)     A. Correct.
(8)     Q. So you were in a car accident, and it
(9) was, in your view, somebody else's fault; is that
(10) correct?
(11)     A. Correct.
(12)     Q. You were trying to get the expenses for
(13) the repair of your car reimbursed to you; is that
(14) correct?
(15)     A. I think that the insurance company was, I
(16) think.
(17)     Q. You said that was in approximately 1991?
(18)     A. Around there.
(19)     Q. Have you ever been a party to a lawsuit?
(20)     A. No.
(21)     Q. You have never been sued before?
(22)     MR. WHITMAN: Prior to this case?
(23)     MR. LEFKOWITZ: Prior to this case.
(24)     A. No.
(25)     Q. What about suing somebody, have you ever

## Page 33

(1)
(2) sued somebody in court?
(3)    A.    No.
(4)    Q.    What was your first job, your first
(5) employment, after graduating from St. Francis
(6) College?
(7)    A.    Volunteers of America.
(8)    Q.    What did you do there?
(9)    A.    Case manager.
(10)    Q.    Was that a paid position?
(11)    A.    Yes.
(12)    Q.    What does it mean to be a case manager?
(13)    A.    Provide services to clients.
(14)    Q.    What kinds of services?
(15)    A.    Case management services: assessment,
(16) referrals, housing referrals.
(17)    Q.    Assessment of what?
(18)    A.    The client's condition, their needs.
(19)    Q.    Well, that could be very broad.
(20) Are you talking about housing needs? Are
(21) you talking about needs with respect to drug
(22) counseling? Are you talking about needs with respect
(23) to marital counseling? Are you talking about
(24) psychiatry?
(25) What kinds of needs are you talking

## Page 34

(1)
(2) about?
(3)    A.    I am referring to housing needs; making
(4) referrals to community-based organizations for
(5) services, such as maybe psychiatric needs,
(6) educational needs, job placement needs, things of
(7) that nature.
(8)    Q.    How soon after you graduated from
(9) St. Francis did you begin working for Volunteers of
(10) America?
(11)    A.    I don't recall.
(12)    Q.    Was it more than a year?
(13)    A.    I don't recall.
(14)    Q.    Was it more than five years?
(15)    A.    I don't recall.
(16)    Q.    What did you do in between the time that
(17) you graduated from St. Francis and the time that you
(18) started working at Volunteers of America?
(19)    A.    Probably traveled.
(20)    Q.    Where did you go?
(21)    A.    Europe.
(22)    Q.    Where in Europe?
(23)    A.    London.
(24)    Q.    Anywhere else?
(25)    A.    I don't recall.

## Page 35

(1)
(2)    Q.    What did you do in London?
(3)    A.    Visited high school friends.
(4)    Q.    Did you have family there still?
(5)    A.    No.
(6)    Q.    When did your family leave London?
(7)    MR. WHITMAN:    Objection to the form.
(8)    Q.    You can answer.
(9)    A.    I don't recall.
(10)    Q.    How long did you work for Volunteers of
(11) America?
(12)    A.    I don't recall how many years.
(13)    Q.    Was it more than one year?
(14)    A.    Yes.
(15)    Q.    Was it more than two years?
(16)    A.    It could have been. I don't recall.
(17)    Q.    Was it more than five years?
(18)    A.    I don't remember.
(19)    Q.    Where did you work when you were at
(20) Volunteers of America; where was the office?
(21)    A.    Ward's Island.
(22)    Q.    Where is that?
(23)    A.    In Manhattan.
(24)    Q.    Who was your supervisor there?
(25)    A.    Mr. Ballard.

## Page 36

(1)
(2)    Q.    Would you spell that name, please.
(3)    A.    B-a-l-l-a-r-d.
(4)    Q.    Prior to beginning work as a case manager
(5) at Volunteers of America, what kind of training had
(6) you received to do the work of a case manager?
(7)    A.    I don't think that I received any
(8) training at that time.
(9)    Q.    Did your studies at St. Francis College
(10) go towards that?
(11)    MR. WHITMAN:    Objection to the form.
(12)    Q.    You can answer.
(13)    A.    I took sociology classes, psychology
(14) classes.
(15)    Q.    Did your degree in communications from
(16) St. Francis have any bearing on your working as a
(17) case manager?
(18)    MR. WHITMAN:    Objection to the form.
(19)    Q.    You can answer.
(20)    A.    Yes.
(21)    Q.    At some point you stopped working at
(22) Volunteers of America; is that so?
(23)    A.    That is correct.
(24)    Q.    Why?
(25)    A.    I don't recall.

Page 37

(1)
(2)   Q.   Did you leave voluntarily or
(3)   involuntarily?
(4)   A.   I don't recall.
(5)   Q.   Do you know what I mean when I say,
(6)   "voluntarily or involuntarily"?
(7)   A.   Yes, I do.
(8)   Q.   So, then, it's possible that Volunteers
(9)   of America fired you?
(10)   A.   It's possible.
(11)   Q.   But you don't remember specifically
(12)   whether you had been fired from that job?
(13)   A.   No.
(14)   Q.   Have you ever been fired from any job?
(15)   A.   Yes.
(16)   Q.   What job was that?
(17)   A.   I think it was Catholic Charities.
(18)   Q.   When did you start working for Catholic
(19)   Charities?
(20)   A.   I don't remember.
(21)   Q.   Where was it?
(22)   A.   Brooklyn.
(23)   Q.   What did you do for Catholic Charities?
(24)   A.   I was an intensive case manager.
(25)   Q.   What are the duties of an intensive case

Page 38

(1)
(2)   manager?
(3)   A.   Providing mental-health counseling to the
(4)   mentally ill, families or, rather, adults living in
(5)   shelters, living in their homes, making visits,
(6)   essentially taking them from their home or from a
(7)   shelter to psychiatric hospitals, clinics, making
(8)   sure that they are taking their medication; general
(9)   follow-up.
(10)   Q.   When did you start working for Catholic
(11)   Charities?
(12)   A.   I don't recall.
(13)   Q.   Was that after you worked at Volunteers
(14)   of America?
(15)   A.   Are you saying was it right after?
(16)   Q.   I am not saying whether it was right
(17)   after. We may get to that, and maybe you will tell
(18)   me that it was right after.
(19)   For now I am just asking, in the sequence
(20)   of time, was it after you left Volunteers of America
(21)   that you worked at Catholic Charities?
(22)   A.   I worked for Catholic Charities after I
(23)   had worked – after I had left Volunteers of America.
(24)   Q.   What was the reason that you were fired
(25)   from Catholic Charities?

Page 39

(1)
(2)   MR. WHITMAN:   Objection to the form.
(3)   Q.   You can answer.
(4)   A.   I was accused of stealing 25 cents.
(5)   Q.   That caused you to be fired?
(6)   A.   Yes.
(7)   Q.   Did you object in any way when they were
(8)   firing you for that reason?
(9)   A.   No.
(10)   Q.   Why not?
(11)   A.   My car was stolen on that same day. I was
(12)   more concerned about my car.
(13)   The 25 cents was part of mileage. When
(14)   we went around to visit clients, they paid you
(15)   mileage.
(16)   I had the approval of my supervisor to go
(17)   visit the clients on the weekend. My supervisor did
(18)   not recall giving me permission on my mileage sheet,
(19)   and the 25 cents he did not recall.
(20)   It was his word against mine. My car was
(21)   stolen at the same time. I was not concerned about
(22)   that anymore, 25 cents. I wanted my car back.
(23)   Q.   Did you have another source of income?
(24)   A.   No.
(25)   Q.   After you took care of whatever it is

Page 40

(1)
(2)   that you had to do with your car, did you go to
(3)   somebody and say, "These are ridiculous
(4)   circumstances. Why are you firing me over this 25
(5)   cents? This is just a misunderstanding"?
(6)   Did you say anything about that or make
(7)   any complaint to try to keep your job?
(8)   A.   There was not a misunderstanding. I had
(9)   concrete proof.
(10)   Q.   Did you tell that to anybody?
(11)   A.   To my supervisor.
(12)   Q.   What happened?
(13)   A.   He said that he did not approve the
(14)   25 cents.
(15)   Q.   Your supervisor, the one who said that he
(16)   did not approve it, is he the one who fired you, or
(17)   did somebody higher up than him fire you?
(18)   A.   There was my supervisor and a program
(19)   director.
(20)   Q.   Both of them were in the room when you
(21)   were fired?
(22)   A.   Yes.
(23)   Q.   Did you go to the program director and
(24)   complain and say, "This doesn't make sense. This is
(25)   just a misunderstanding," or "I have this concrete

### Page 41

(1)
(2) proof"; did you say anything about this to try to
(3) keep your job?
(4)    A.   Yes.
(5)    Q.   What did this program director say?
(6)    A.   Nothing.
(7)    Q.   Is that the only job that you were ever
(8) fired from?
(9)    A.   As far as my recollection, yes.
(10)    Q.   But it's possible that you were fired
(11) from Volunteers of America; isn't that so?
(12)    A.   It's possible.
(13)    Q.   What year did you stop working at
(14) Volunteers of America?
(15)    A.   I don't recall.
(16)    Q.   Were you still in your 20s?
(17)    A.   It could be. I don't recall.
(18)    Q.   Mr. Okebiyi, do you have a resume?
(19)    A.   Yes, I do.
(20) RQ MR. LEFKOWITZ: I am calling for
(21) production of a copy of the resume.
(22)     MR. WHITMAN:   Make your document
(23) requests in writing and they will be
(24) responded to as appropriate.
(25)    Q.   After you stopped working at

### Page 42

(1)
(2) Volunteers of America, what was your next job?
(3)    A.   I don't remember.
(4)    Q.   Well, at some point you started working
(5) for Catholic Charities; is that so?
(6)    A.   At some point, yes.
(7)    Q.   Were there any other jobs that you had in
(8) between working for Volunteers of America and
(9) Catholic Charities?
(10)    A.   It's possible. I don't have my resume in
(11) front of me.
(12)    Q.   You need your resume to know where you
(13) worked in your life?
(14)    A.   Yes.
(15)    Q.   How long a gap was there between the time
(16) that you worked at Volunteers of America and Catholic
(17) Charities?
(18)    A.   I don't recall.
(19)    Q.   Was it more than one year?
(20)    A.   I don't recall.
(21)    Q.   Was it more than five years?
(22)    A.   I don't recall. I don't have my resume
(23) in front of me.
(24)    Q.   When was it that you were fired from
(25) Catholic Charities?

### Page 43

(1)
(2)    A.   I don't recall.
(3)    Q.   Was it in the '80s?
(4)    A.   I don't recall.
(5)    Q.   You have no guess, you have no idea as to
(6) when you worked at Catholic Charities?
(7)     MR. WHITMAN:   Objection to the form.
(8) You did not ask him to guess.
(9)    Q.   What is your best guess as to when you
(10) started working at Catholic Charities?
(11)    A.   In the '80s, I would say.
(12)    Q.   Let's back up now because, obviously,
(13) there has been a parsing of the words here, so I
(14) guess I have to go back.
(15) What is your best guess as to when you
(16) left Nigeria to go to England?
(17)     MR. WHITMAN:   Objection; asked and
(18) answered.
(19) We have been over this.
(20)     MR. LEFKOWITZ:   You just said a moment
(21) ago that I did not ask about his best guess,
(22) I did not ask about an estimate.
(23) You are absolutely right about that.
(24) I did not ask about it for any of those
(25) questions.

### Page 44

(1)
(2) I am going back and I am asking about
(3) it now.
(4)    Q.   What is your best guess as to when you
(5) left Nigeria to go to school in England?
(6)    A.   My best guess -- I don't know. I am not
(7) going to guess. I don't know. I don't recall.
(8)    Q.   Is that the same answer that you have for
(9) all of the questions that I asked when I was asking
(10) for dates; is that your answer?
(11)     MR. WHITMAN:   Objection to the form.
(12)     MR. LEFKOWITZ:   I will ask it all
(13) again.
(14)    Q.   What is your best guess of the year
(15) when you started going to school in England, at
(16) St. George's?
(17)    A.   I don't recall.
(18)    Q.   I am asking for your best guess.
(19)    A.   Probably in the '70s.
(20)    Q.   What about your best guess as to when you
(21) started going to Whitefield Secondary School?
(22)    A.   In the '70s.
(23)    Q.   And your best guess as to when you
(24) started at St. Francis College?
(25)    A.   Probably late -- mid-'80s, probably.

## Page 45

(1)
(2)   Q.   And your best guess as to the year when
(3) you started working at Volunteers of America?
(4)   A.   I don't know.
(5)   Q.   You cannot even hazard a guess?
(6)   A.   No.
(7)   Q.   And your best guess as to the year when
(8) you stopped working at Volunteers of America?
(9)   A.   I don't recall.
(10)   Q.   Again, you can't even hazard a guess?
(11)   A.   No.
(12)   Q.   What about your best guess as to when you
(13) started working for Catholic Charities?
(14)   A.   Again, I don't recall.
(15)   Q.   You can't even hazard a guess?
(16)   A.   No.
(17) I don't have my resume in front of me.
(18)   Q.   Again, you need your resume to make a
(19) guess; is that what you are saying?
(20)   A.   Yes.
(21) If you want me to pinpoint it down, yes.
(22)   Q.   I am asking for your best estimate as to
(23) a guess.
(24) I am not pinpointing you to anything,
(25) sir.

## Page 46

(1)
(2)   A.   I don't have my resume in front of me.
(3)   Q.   What is your best guess of an estimate as
(4) to how long you worked at Catholic Charities?
(5)   A.   Maybe two or three years.
(6)   Q.   And your best guess of an estimate as to
(7) when it was that you stopped working at Catholic
(8) Charities?
(9)   A.   I don't recall.
(10)   Q.   You can't even hazard a guess?
(11)   A.   No.
(12)   Q.   You have no idea when you stopped working
(13) at Catholic Charities?
(14)   A.   No.
(15)   Q.   What about a decade?
(16)   A.   What about a decade?
(17)   Q.   Was it in the '80s, the '90s, the 2000s?
(18)   A.   I don't recall.
(19)   Q.   Could it have been last year that you
(20) stopped working at Catholic Charities?
(21)   A.   Could it have been last year that I
(22) stopped working at Catholic Charities?
(23) No.
(24) I was with AAPCI last year.
(25)   Q.   When did you start working at AAPCI?

## Page 47

(1)
(2)   A.   When it was founded.
(3)   Q.   When was that?
(4)   A.   1996.
(5)   Q.   Now we have got a year.
(6) Where did you work before you worked at
(7) AAPCI?
(8)   A.   The council.
(9)   Q.   What is the council?
(10)   A.   Where I worked.
(11)   Q.   What is it?
(12)   A.   It's a nonprofit organization.
(13)   Q.   It's called "The Council"?
(14)   A.   163rd Street Improvement Council.
(15)   Q.   Would you say that again, please.
(16)   A.   163rd Street Improvement Council.
(17)   Q.   When did you stop working there and move
(18) on to start working at AAPCI?
(19)   A.   I was working at both.
(20)   Q.   So you were starting AAPCI at the same
(21) time that you were still working at the council?
(22)   A.   Yes.
(23)   Q.   When did you start working at the
(24) council?
(25)   A.   When did I start?

## Page 48

(1)
(2)   Q.   Yes.
(3)   A.   I don't remember.
(4)   Q.   How long did you work at the council?
(5)   A.   Approximately, my best guess, two, maybe
(6) three years.
(7)   Q.   So that would be approximately 1994 or
(8) 1993 that you started working at the council; is that
(9) correct?
(10)   A.   I don't know if it's correct. That is my
(11) best guess.
(12) MR. LEFKOWITZ:   Off the record.
(13) (Discussion off the record.)
(14) (Short recess taken.)
(15) (Record read.)
(16) MR. LEFKOWITZ:   Back on the record.
(17) BY MR. LEFKOWITZ:
(18)   Q.   What was your job at the council?
(19)   A.   I was the director of a place called
(20) Ogden Avenue Residence.
(21)   Q.   What happened at the Ogden Avenue
(22) Residence?
(23) MR. WHITMAN:   Objection to the form.
(24)   Q.   You can answer.
(25)   A.   What do you mean, "what happened"?

(1)
(2)  Q.   What kind of business is it? What is it?
(3)  A.   It's AIDS housing.
(4)  Q.   Where is the Ogden Avenue Residence?
(5)  A.   In the Bronx.
(6)  Q.   Is it a building or a part of a building
(7)  or some sort of unit?
(8)  A.   It's a building.
(9)  Q.   With you being the director, were you the
(10) director of everything that happened in that
(11) building?
(12) A.   Yes.
(13) Q.   There was no one higher than you in that
(14) building; is that correct?
(15) A.   No.
(16) I had an executive director, my boss.
(17) Q.   Was there anyone above him?
(18) A.   Above her was the board of directors.
(19) Q.   Did the council have other facilities,
(20) other than the Ogden Avenue Residence, or something
(21) else?
(22) A.   They had many other facilities.
(23) Q.   So you were the director of the Ogden
(24) Avenue Residence, and there would have been other
(25) directors at other facilities?

(1)
(2)  A.   I was the director of the Ogden Avenue
(3)  Residence, one site, and I oversaw scattered site
(4)  housing.
(5)  Q.   Would there have been other directors for
(6)  other sites?
(7)  A.   I guess so.
(8)  Q.   Before you started working at the council
(9)  in 1993, where did you work?
(10) A.   Prior to the council, I believe it
(11) was – bear with me a minute. My mind just went
(12) blank.
(13) Q.   The question was where you worked prior
(14) to 1993, when you started at the council.
(15) A.   Ocean Avenue – Oceanhill-Brownsville
(16) Tenants Association.
(17) Q.   What did you do there?
(18) A.   I was director of the neighborhood
(19) employment center.
(20) Q.   When did you start working there?
(21) A.   I don't recall that date.
(22) Q.   Your best guess.
(23) A.   I don't recall.
(24) Q.   You started working for the council in
(25) 1993, or approximately 1993.

(1)
(2)  About how long did you work at
(3)  Oceanhill-Brownsville Tenants Association?
(4)  A.   Approximately, maybe two years.
(5)  Q.   So that puts us at approximately 1991.
(6)  Where did you work before then?
(7)  A.   I don't recall.
(8)  Q.   Right now, by my count, we have five
(9)  jobs.
(10) A.   All right.
(11) Q.   You are currently working at AAPCI?
(12) A.   Right now?
(13) Q.   Yes.
(14) A.   Yes.
(15) Q.   Then there is Oceanhill-Brownsville
(16) Tenants Association, we have the council, we have
(17) Catholic Charities, and we have Volunteers of
(18) America.
(19) Can you remember any other jobs that you
(20) have had?
(21) MR. WHITMAN:   Since college?
(22) MR. LEFKOWITZ:   Since college is fine.
(23) A.   Since college, no, I don't remember.
(24) Q.   When you left the council, did you leave
(25) voluntarily or involuntarily?

(1)
(2)  A.   I resigned.
(3)  Q.   Why did you resign?
(4)  A.   Serenity House was just about to open.
(5)  Q.   When you say, Serenity House," you are
(6)  talking about AAPCI?
(7)  A.   Correct.
(8)  Q.   So that would have been in approximately
(9)  1996 that you resigned from the council?
(10) A.   No, it would not be.
(11) Q.   Is it correct, then, that AAPCI started
(12) doing business in 1996, and you started working
(13) there, but continued to work at the council for a
(14) period of time?
(15) A.   AAPCI was incorporated in 1996.
(16) During that time we were seeking funding
(17) from the city and the state.
(18) So while applications were in for the
(19) city and the state, I was working with the council.
(20) Q.   Once AAPCI received the funding, is that
(21) when you resigned from the council?
(22) A.   That is when I left the council, yes.
(23) Q.   Did you leave Oceanhill-Brownsville
(24) Tenants Association voluntarily or involuntarily?
(25) A.   My guess would be involuntarily.

Page 53

(1)
(2) They lost their funding.
(3)     Q.    So they were no longer doing any business
(4) at all; is that correct?
(5)     A.    The program that I was working under lost
(6) its funding.
(7)     Q.    So there was no longer a job for you to
(8) do?
(9)     A.    In that program, correct.
(10)     Q.    I am just trying to get an order or a
(11) sequence here.
(12) Currently, you are at AAPCI, correct?
(13)     A.    Correct.
(14)     Q.    Before that you were at the council,
(15) correct?
(16)     A.    Correct.
(17)     Q.    Before the council you were at the
(18) Oceanhill-Brownsville Tenants Association?
(19)     A.    My best estimate, yes.
(20)     Q.    Before Oceanhill-Brownsville Tenants
(21) Association, you were at Catholic Charities; is that
(22) correct?
(23)     A.    It's possible. I don't recall.
(24)     Q.    Before that you were at Volunteers of
(25) America; is that correct?

Page 54

(1)
(2)     A.    It's possible.
(3)     Q.    So you are not sure whether you started
(4) working first at Volunteers of America or Catholic
(5) Charities; is that what you are saying?
(6)     A.    No, that is not what I am saying.
(7)     Q.    If you would, your best guess, give me
(8) the sequence of these jobs we have talked about in
(9) time, when you worked at them, starting from the
(10) oldest to the most recent, the first job to the last
(11) job.
(12)     A.    The first job would be Volunteers of
(13) America.
(14)     Q.    And the next job would be?
(15)     A.    I don't know what you have there.
(16)     Q.    I am asking you.
(17)     A.    In sequence?
(18)     Q.    Yes.
(19)     A.    I don't know. I don't have my resume in
(20) front of me.
(21)     Q.    Again, you are saying that you need your
(22) resume to answer that question?
(23)     A.    To give you a full answer, yes.
(24)     Q.    I am not asking for a full answer.
(25) I am not asking for set in stone.

Page 55

(1)
(2) I am asking for your best guess.
(3)     MR. WHITMAN:    Objection; asked and
(4) answered.
(5)     MR. LEFKOWITZ:    I will rely on that
(6) record, then, since counsel has made that
(7) objection.
(8)     Q.    Who formed AAPCI?
(9)     MR. WHITMAN:    Objection to the form.
(10)     Q.    You can answer.
(11)     A.    You mean who incorporated it?
(12)     Q.    Yes.
(13)     A.    Three individuals.
(14)     Q.    Who?
(15)     A.    Ms. Brenda Francis, Ms. Nadine Whitted,
(16) and myself.
(17)     Q.    Would you spell their names, please.
(18)     A.    Which one?
(19)     Q.    All of them.
(20)     A.    Nadine Whitted, N-a-d-i-n-e
(21) W-h-i-t-t-e-d.
(22) Brenda Francis, B-r-e-n-d-a
(23) F-r-a-n-c-i-s.
(24) Myself, Matthew Okebiyi.
(25)     Q.    What caused you, along with Ms. Francis

Page 56

(1)
(2) and Ms. Whitted, to form AAPCI?
(3)     MR. WHITMAN:    Objection to the form.
(4)     Q.    You can answer.
(5)     A.    I have experience in social services, and
(6) I wanted to do something in my community to address
(7) various issues.
(8) To do that, we had to first incorporate,
(9) set up an organization to provide services.
(10)     Q.    Why couldn't you do that at your job at
(11) the council?
(12)     MR. WHITMAN:    Objection to the form.
(13)     Q.    You can answer.
(14)     A.    Why couldn't I do what?
(15)     Q.    The reasons that you just gave me, it
(16) seems like you could have done those things in
(17) continuing your job working at the council.
(18)     A.    No, I couldn't.
(19)     Q.    What was the difference between what you
(20) were doing at the council, and what you were doing at
(21) AAPCI?
(22)     A.    The council is somebody else's
(23) organization. I was hired for a specific job. I
(24) cannot tell them what to do.
(25)     Q.    So you wanted to be the boss?

(1)
(2)   A.   No, not be the boss, providing a service
(3)   to the community.
(4)   Q.   But you wanted to have your own company?
(5)   A.   It is about providing a service to the
(6)   community.
(7)   Q.   Has the company always been known by that
(8)   name, or was there a name change at some point?
(9)   A.   Which company?
(10)   Q.   AAPCI.
(11)   A.   No, that has always been the name.
(12)   Q.   What services does it?
(13)   A.   Domestic violence services.
(14)   Q.   What services does AAPCI provide to the
(15)   community?
(16)   A.   Currently, we are providing domestic
(17)   violence services.
(18)   Q.   What does that mean, to provide domestic
(19)   violence services?
(20)   A.   We shelter homeless families who are
(21)   fleeing domestic violence situations from all over
(22)   New York City.
(23)   Q.   Is that it, or is there anything else?
(24)   A.   That is what it means to provide domestic
(25)   violence services.

(1)
(2)   Q.   I am asking you whether it means anything
(3)   else.
(4)   A.   I don't understand your question.
(5)   Q.   Is there counseling involved, or is it
(6)   just sheltering?
(7)   A.   There are support services, yes.
(8)   Q.   Other than sheltering, what services does
(9)   AAPCI provide?
(10)   A.   You mean Serenity House?
(11)   Q.   What is the difference between AAPCI and
(12)   Serenity House?
(13)   A.   AAPCI is the parent organization.
(14)   Serenity House is the program.
(15)   Q.   What other programs are there that AAPCI
(16)   is the parent for?
(17)   A.   Just Serenity House right now.
(18)   Q.   Serenity House, then, provides the
(19)   domestic violence services that you just mentioned?
(20)   A.   Correct.
(21)   Q.   Other than shelter, what other services
(22)   does Serenity House provide?
(23)   A.   Housing; case management services;
(24)   recreational services; after-school programs,
(25)   child-care programs; security, enforcing security;

(1)
(2)   management, of course; maintenance; referrals to
(3)   programs outside the facility into the community.
(4)   Q.   Have you finished your answer?
(5)   A.   Yes.
(6)   Q.   Are these services available to people
(7)   who are not residents of Serenity House?
(8)   For example, the child-care services that
(9)   you mentioned, are they only available to somebody
(10)   who is being sheltered by Serenity House, or is
(11)   somebody who lives elsewhere able to avail themselves
(12)   of these child-care services?
(13)   A.   No.
(14)   It's only available to those within the
(15)   building, the residence.
(16)   Q.   So there are families being sheltered,
(17)   and there are child-care services, and counseling,
(18)   and all of these other services being provided to
(19)   these families being sheltered?
(20)   A.   That is correct.
(21)   Q.   What is your title and job
(22)   responsibilities?
(23)   A.   I am the executive director. My role is
(24)   as follows: one, look out for the best interests of
(25)   the City and State of New York – and it's not

(1)
(2)   necessarily in this order, I am just giving you my
(3)   roles – two, look out for the best interests and
(4)   services to the residents of the facility; three,
(5)   make sure that we are fully staffed, look out for the
(6)   interests of all staff members; four, look out for
(7)   the interests of all of the board of directors.
(8)   That is all that I remember right now.
(9)   Q.   How many employees are there currently at
(10)   AAPCI?
(11)   A.   I believe it's 36.
(12)   Q.   What is the most number of employees that
(13)   AAPCI has had at any given time?
(14)   A.   Thirty-six.
(15)   Q.   So you are currently at the most staff
(16)   that you have ever had?
(17)   A.   We have some vacancies now, but optimum,
(18)   36.
(19)   Q.   Who is Brenda Francis?
(20)   A.   She is one of the individuals who
(21)   assisted in incorporating the organization years ago.
(22)   Q.   In 1996?
(23)   A.   Yes.
(24)   Q.   How did you know her, or how did you meet
(25)   her?

| Page 61 | Page 63 |
|---|---|

**Page 61**

(1)
(2)    A.   Ms. Francis I knew from Volunteers of
(3) America, I believe.
(4)    Q.   What did she do at Volunteers of America?
(5)    A.   I believe at the time she might have been
(6) the administrative assistant to a director or so,
(7) something like that. I don't quite recall.
(8)    Q.   Was your employment at Volunteers of
(9) America the first time that you ever met Ms. Francis,
(10) or did you know her before you started working at
(11) Volunteers of America?
(12)    A.   No.
(13) I think this was the first time.
(14)    Q.   How is it that she came to be involved in
(15) the formation of AAPCI?
(16)    A.   Fast forwarding many years, I was
(17) inquiring about how one goes about incorporating from
(18) different individuals, church members and so on, and
(19) I think during a discussion I mentioned it to her,
(20) and somebody that she knew did incorporation of
(21) nonprofits.
(22) One of the requirements is three
(23) people – as per the State of New York – three
(24) people are needed to be incorporated, and she was one
(25) of three.

**Page 63**

(1)
(2)    Q.   Was it more than a year?
(3)    A.   I don't recall.
(4)    Q.   Could it have been more than a year?
(5)    A.   It could have been less. It could have
(6) been more.
(7)    Q.   But she was never an employee of the
(8) company?
(9)    A.   No.
(10)    Q.   And she never had a title?
(11)    A.   No.
(12)    Q.   Did she report to work every day and
(13) perform any duties at Serenity House?
(14)    A.   With all due respect, I think that you
(15) are getting – this is incorporation.
(16) Serenity House came years later.
(17)    Q.   When did Serenity House come?
(18)    A.   Maybe four or five years later.
(19)    Q.   So that would be around 2000?
(20)    A.   Around then.
(21)    Q.   What was the business of AAPCI from 1996
(22) to 2000?
(23)    A.   Seeking funding.
(24)    Q.   Seeking funding?
(25)    A.   Yes.

| Page 62 | Page 64 |
|---|---|

**Page 62**

(1)
(2)    Q.   Other than being one of those three
(3) people in the incorporation, does she have any
(4) involvement in the running of, or the maintenance of,
(5) or the business of AAPCI?
(6)    MR. WHITMAN:   Does she today or did
(7) she then?
(8)    Q.   At the time that it was formed, did
(9) she have any involvement in the business of AAPCI?
(10)    A.   I don't understand what you mean by
(11) "involvement."
(12)    Q.   Did she become an employee of the
(13) company?
(14)    A.   No.
(15)    Q.   Did she ever have a title with the
(16) company?
(17)    A.   No.
(18)    Q.   Was she ever a member of the board of
(19) directors of the company?
(20)    A.   The first three on paper for the
(21) incorporation, yes.
(22)    Q.   How long did she remain a member of the
(23) board of directors?
(24)    A.   I don't recall. I think maybe – I don't
(25) recall.

**Page 64**

(1)
(2)    Q.   You have to answer yes or no.
(3)    A.   Yes.
(4)    Q.   So there was actually no business going
(5) on, there was nobody being sheltered, there were no
(6) services being provided to anybody from 1996 to 2000?
(7)    A.   Correct.
(8)    Q.   Ms. Francis, then, assisted in forming
(9) the company, but she had no involvement in doing
(10) anything once Serenity House was formed; is that
(11) correct?
(12)    A.   That is correct.
(13)    Q.   Did Ms. Francis assist in obtaining the
(14) funding?
(15)    A.   No.
(16)    Q.   Other than being one of the three
(17) required people that you have talked about, did
(18) Ms. Francis do anything with respect to AAPCI or
(19) Serenity House?
(20)    A.   Like what?
(21)    Q.   I am asking you, sir.
(22) Did she do anything other than having her
(23) name on that piece of paper and being one of the
(24) three people that formed the company?
(25)    A.   Give advice.

| Page 65 | |
|---|---|

(1)
(2) Q. Anything else?
(3) A. No.
(4) As a founding board member, just give
(5) advice.
(6) Q. Were there board members from 1996 to
(7) 2000?
(8) A. I believe there were.
(9) Q. How many were there?
(10) MR. LEFKOWITZ: Off the record.
(11) (Discussion off the record.)
(12) (Record read.)
(13) MR. LEFKOWITZ: Back on the record.
(14) A. Board meetings were, approximately, maybe
(15) every six months, something like that.
(16) Q. Is it fair to say that they were fairly
(17) infrequent and short because you had not obtained the
(18) funding yet?
(19) A. That is correct.
(20) Q. So the topics of the board meetings would
(21) be obtaining funding?
(22) A. Essentially.
(23) Q. And the process of doing so?
(24) A. Right.
(25) Q. How do you know Nadine Whitted?

| Page 67 | |
|---|---|

(1)
(2) Q. You can answer.
(3) A. Repeat the question. I don't understand
(4) it.
(5) Q. We know that Ms. Francis and Ms. Whitted
(6) had no duties other than being named on the formation
(7) papers; isn't that correct?
(8) A. Yes.
(9) Q. At some point there were actual board
(10) members who had actual duties. Serenity House
(11) presumably was up and running at some point, and you
(12) had actual board members who were overseeing things,
(13) or doing what it is that board members do.
(14) A. Yes.
(15) Q. I am interested in finding out when that
(16) actually happened.
(17) MR. WHITMAN: I will object to the
(18) extent that it misstates the prior testimony.
(19) Q. When they started to perform duties;
(20) is that your question?
(21) Q. I guess it's confusing, so let me
(22) withdraw that and let me ask you another question.
(23) Who are the current board members of
(24) AAPCI?
(25) A. The current board members are my board

| Page 66 | |
|---|---|

(1)
(2) A. I attended various community board
(3) meetings when I worked for different organizations,
(4) and she was the district manager of – I forgot which
(5) community board.
(6) We talked about what the community needs,
(7) and I informed her that I am trying to create a
(8) community, would she be interested, I would be
(9) honored if she would be on our board, and that was
(10) it.
(11) Q. Approximately, when was that? Was that
(12) shortly before 1996?
(13) A. When I first met her?
(14) Q. Yes.
(15) A. Yes.
(16) Q. Did Ms. Whitted ever perform any duties
(17) or hold a title or a position at Serenity House?
(18) A. No.
(19) Q. It was like Ms. Francis, she was a
(20) founding board member and that is it?
(21) A. Correct.
(22) Q. At what point did you have board members
(23) who performed duties other than simply having their
(24) name on the formation papers?
(25) MR. WHITMAN: Objection to the form.

| Page 68 | |
|---|---|

(1)
(2) chair –
(3) Q. I am asking for their names, sir.
(4) A. My board chair, Ms. Pamela Junior,
(5) Mr. Stephen Atkins, Mr. Andy Alege, Onyekwere
(6) Onwumere -- don't ask me to spell the last name.
(7) Q. What does it sound like?
(8) A. Onyekwere Onwumere (pronunciation).
(9) Q. We will just spell it phonetically for
(10) the record.
(11) MR. LEFKOWITZ: Off the record.
(12) (Discussion off the record.)
(13) MR. LEFKOWITZ: Back on the record.
(14) A. Ms. Magalie Ocean, Mr. Walter Campbell.
(15) How many names do you have there?
(16) Q. We have Pamela Junior, Stephen Atkins,
(17) Andy Alege, Onyekwere Onwumere, Magalie Ocean, and
(18) Walter Campbell.
(19) A. Bernadette Parker, Sarah Polight-Bates.
(20) Is that nine?
(21) Q. It's eight.
(22) A. Ms. Edna Johnson.
(23) Q. Do any of those people that you have just
(24) named hold any titles or job duties, actually working
(25) for AAPCI or Serenity House?

Page 69

(1)
(2)    A.    They are all board members. They don't
(3) work there.
(4)    Q.    They are just board members?
(5)    A.    Board members.
(6)    Q.    Is there a period of time that they
(7) remain board members; is there a time limit?
(8)    Q.    How long are board members board members?
(9)    A.    I don't have the bylaws in front of me,
(10) but I believe it's maybe two or three years, or
(11) something like that, and we vote again. I don't
(12) remember exactly.
(13)    Q.    How long has Stephen Atkins been a board
(14) member?
(15)    A.    I don't recall.
(16)    Q.    More than just two or three years?
(17)    A.    No.
(18)    Q.    So he is a recent addition to the board?
(19)    A.    Probably.
(20)    Q.    What about Andy Alege?
(21)    A.    He has been on the board for a while.
(22)    Q.    What does "a while" mean?
(23)    A.    I don't know how many years.
(24)    Q.    More than five?
(25)    A.    Probably.

Page 70

(1)
(2)    Q.    Onyekwere Onwumere.
(3)    A.    Probably the same time as Mr. Atkins.
(4)    Q.    So a recent addition to the board?
(5)    A.    Yes.
(6)    Q.    I think that I skipped Pamela Junior.
(7) How long has Pamela Junior been on the
(8) board?
(9)    A.    A recent addition.
(10) When I say, "a recent addition," I am
(11) talking about at least a year maybe.
(12)    Q.    At least a year, but less than two to
(13) three years; is that what you are saying?
(14)    A.    Less than five years.
(15)    Q.    Is that your answer for all of these,
(16) when you say a "recent addition," it is more than a
(17) year, but less than five years?
(18)    A.    Yes.
(19)    Q.    Magalie Occean.
(20)    A.    The same thing.
(21)    Q.    A recent addition?
(22)    A.    Off the top of my head, I don't recall.
(23)    Q.    Again, that would be more than one year
(24) and less than five years?
(25)    A.    More than one – probably.

Page 71

(1)
(2)    Q.    Walter Campbell.
(3)    A.    The same thing.
(4)    Q.    Bernadette Parker.
(5)    A.    More than one year and – approximately
(6) five years.
(7)    Q.    Sarah Polight-Bates.
(8)    A.    The same thing, about a year or more.
(9)    Q.    Edna Johnson.
(10)    A.    The same thing, that is my best
(11) guesstimate.
(12)    Q.    When did you first meet Pamela Junior?
(13)    A.    When did I first meet Ms. Junior?
(14) I met Ms. Junior at a community board
(15) meeting. I gave a presentation to the community
(16) board, and I believe she was on the community board
(17) at that time.
(18)    Q.    When was that?
(19)    A.    I don't remember. It was a while ago.
(20)    Q.    How did she come to become a member of
(21) the board?
(22)    A.    She is a community person, very
(23) knowledgeable. Many meetings that I attend, whether
(24) it's community board meetings, community affairs, she
(25) is there.

Page 72

(1)
(2) She is very well-spoken, knowledgeable,
(3) and this was somebody who I felt needed to be on our
(4) organization's board of directors.
(5)    Q.    Did you ask her?
(6)    A.    Yes.
(7)    Q.    When was that?
(8)    A.    At one of the meetings that I attended.
(9) I don't know when it was.
(10) I asked her if she would be interested,
(11) and she said she will think about it.
(12)    Q.    I guess eventually she agreed?
(13)    A.    Eventually.
(14)    Q.    Are you friends with Ms. Junior?
(15)    A.    I respect my board members.
(16)    Q.    Do you socialize with Ms. Junior?
(17)    A.    Socialize, yes. I attend functions of
(18) board members together.
(19) If we are trying to raise money for some
(20) organization, and I am invited, yes.
(21)    Q.    Have you ever been to her home?
(22)    A.    Yes.
(23)    Q.    When is the last time you were to her
(24) home?
(25)    A.    I don't recall.

(1)
(2) Q. How many times have you been to her home?
(3) A. Maybe four times. I don't know.
(4) In the last year, maybe twice, three
(5) times. Maybe to drop off some documents for a
(6) signature.
(7) Q. Has she ever been to your home?
(8) A. No.
(9) Q. When did you first meet Stephen Atkins?
(10) A. We were trying to raise money, and I
(11) believe it was – we needed some finances from a
(12) bank, and Mr. Atkins was the manager, I believe.
(13) He was the person that we were
(14) communicating with on a regular basis, and because he
(15) worked in the bank, I felt we needed somebody from
(16) the bank to be on the board.
(17) I spoke to him and gave his resume to my
(18) board chair for consideration.
(19) Q. Did he work for a bank from which AAPCI
(20) was looking for funding or another bank?
(21) A. He worked at the bank that we bank with.
(22) Q. Who is "we"?
(23) A. AAPCI.
(24) Q. When you say, "banked," you mean your
(25) checking account or money market account, whatever it

(1)
(2) may be, that is where he works, that bank?
(3) A. Yes.
(4) Q. What bank is that?
(5) A. It was WaMu at the time.
(6) We were applying for something, funding
(7) from somewhere, and they needed a letter from the
(8) bank saying we have an account there.
(9) I believe he was the person overseeing
(10) our nonprofit account, so that is who I was directed
(11) to talk to.
(12) Q. When did you first meet Andy Alege?
(13) A. Driving – this was years ago – driving
(14) through Brooklyn, looking at different construction
(15) sites, looking at architecture, I went to the site
(16) and I met him.
(17) He was a person working on the site, or
(18) overseeing the – I guess they call them a GC or
(19) whatever it was.
(20) Q. By "GC," you are talking about a
(21) contractor?
(22) A. Yes.
(23) Knowing that we are going to be
(24) developing Serenity House, I needed someone to
(25) translate architectural designs for us, and this was

(1)
(2) the gentleman that – we thought he knows the
(3) industry, he can serve on the board.
(4) Q. Onyekwere Onwumere.
(5) A. I don't recall how I met Onyekwere, but
(6) she sent her resume – I think she may have sent us
(7) an e-mail, seen our website or something, and sent
(8) her resume saying she was interested in being a part
(9) of our organization, and her resume was sent to the
(10) board chair for consideration.
(11) Q. Had you known her before that?
(12) A. No.
(13) Q. When did you first meet Magalie Ocean?
(14) A. Ms. Ocean I met at a job where I worked
(15) before.
(16) Q. What job was that?
(17) A. Bushwick Economic Development
(18) Corporation. I think she was a social services
(19) supervisor at the time.
(20) After we both left there – I think after
(21) we both left there, years later, we needed somebody,
(22) since AAPCI was going to be a social services
(23) organization, and Ms. Ocean knows social services
(24) very well, so I asked her to come on board.
(25) Q. So you had kept in touch with her all

(1)
(2) that time since you left Bushwick Economic
(3) Development Corporation?
(4) A. Off and on.
(5) Q. When is it that you worked at the
(6) Bushwick social services organization?
(7) A. I don't recall.
(8) Q. What year?
(9) A. I don't recall.
(10) Q. Your best guess.
(11) A. I would have to look at my resume. I
(12) don't recall.
(13) Q. Can you place it anywhere in time among
(14) your other jobs that we talked about?
(15) A. No, I don't remember.
(16) Q. What did you do there?
(17) A. Where?
(18) Q. At the Bushwick social services
(19) organization.
(20) A. I was a director.
(21) Q. Of what?
(22) A. Of a facility. Of a shelter, a homeless
(23) shelter.
(24) Q. How long did you work there?
(25) A. My best guess, maybe three, four years,

Page 77

(1)
(2)  something like that.
(3)  Again, I am guessing.
(4)  Q.  Did you stop working there voluntarily or
(5)  involuntarily?
(6)  A.  I resigned.
(7)  Q.  Why?
(8)  A.  I had enough for a while.
(9)  Q.  Were you burned out?
(10)  A.  Tired.
(11)  Q.  What did you do after you resigned?
(12)  A.  I stayed home.
(13)  Q.  You did not work?
(14)  A.  No.
(15)  Q.  For how long did you not work?
(16)  A.  I don't recall.
(17)  Q.  What was the next job that you had when
(18)  you decided to go back to work?
(19)  A.  I don't recall. I would have to look at
(20)  my resume.
(21)  Q.  When did you meet Walter Campbell?
(22)  A.  Community board meetings in the
(23)  community, trying to do things in different
(24)  communities.
(25)  I asked Mr. Campbell if he would join our

Page 79

(1)
(2)  When did I meet her?
(3)  I don't recall when I met her.
(4)  Oceanhill-Brownsville, when I was working
(5)  there, the employment center, Ms. Bates knew the
(6)  community, and knew what was going on in the
(7)  community.
(8)  She wanted to know what it was that we
(9)  did. She was – she knew the community very well.
(10)  Q.  When you say she wanted to know what you
(11)  did, are you talking about AAPCI and Serenity House?
(12)  A.  No.
(13)  Just basically when I was working at
(14)  Oceanhill-Brownsville.
(15)  It's office space, the ground floor,
(16)  people see it. People walk by, "What sort of
(17)  facility is this?" that type of question.
(18)  Because of her community involvement, we
(19)  told her about Serenity House, up and coming, AAPCI.
(20)  She kept in touch to see how the
(21)  organization was developing.
(22)  She wanted to join the organization later
(23)  on. Her resume was passed on to the board later on
(24)  for consideration.
(25)  Q.  Edna Johnson.

Page 78

(1)
(2)  board. He said that he would consider it. I passed
(3)  his resume to the board chair.
(4)  That is how I met him.
(5)  Q.  What about Bernadette Parker, when did
(6)  you meet her?
(7)  A.  Ms. Parker was back in – I don't
(8)  remember what year that I met Ms. Parker, but I asked
(9)  Ms. Parker if she would join the board as the board
(10)  chair when the initiative started, we were in the
(11)  process of just getting Serenity House off the
(12)  ground, and she agreed to join the board as the board
(13)  chair.
(14)  Q.  So she was on the board starting right
(15)  from the very beginning, in around 2000?
(16)  A.  Around then, yes.
(17)  Q.  You knew her before you asked her to be a
(18)  board member?
(19)  A.  Yes.
(20)  Q.  For how long had you known her?
(21)  A.  I want to say about three, four years, if
(22)  that. I don't recall.
(23)  Q.  What about Sarah Polight-Bates, when did
(24)  you meet her?
(25)  A.  Ms. Bates was a community activist.

Page 80

(1)
(2)  A.  I attended a police department – I think
(3)  that the word or the term is "police department
(4)  community affairs," something like that, where they
(5)  have meetings for the community with the police
(6)  department.
(7)  I believe, unless I am mistaken,
(8)  Ms. Johnson was the chair of that committee.
(9)  Again, I could be using the wrong
(10)  terminology.
(11)  I had seen her at other events. She is
(12)  somebody who knows the community very well. I asked
(13)  her if she would be interested in joining the
(14)  organization.
(15)  She gave us her resume. We passed it on
(16)  to the board. We let the board decide.
(17)  Q.  Was Pamela Junior on the board at the
(18)  time that Ms. Bowers worked at AAPCI?
(19)  A.  No.
(20)  Q.  What about Stephen Atkins?
(21)  A.  No.
(22)  Q.  Andy Alege?
(23)  A.  Yes.
(24)  Q.  Onyekwere Onwumere?
(25)  A.  No.

(1)
(2)    Q.    Magalie Occean?
(3)    A.    No.
(4)    Q.    Walter Campbell?
(5)    A.    No.
(6)    Q.    Bernadette Parker?
(7)    A.    Yes.
(8)    Q.    Sarah Polight-Bates?
(9)    A.    No.
(10)    Q.    Edna Johnson?
(11)    A.    No.
(12)    Q.    Of your current board members, the only
(13) ones that were there in 2005 and 2006 were Andy Alege
(14) and Bernadette Parker; is that correct?
(15)    MR. WHITMAN:    Objection to the form.
(16)    A.    There is a third person who was there
(17) at the time when the board was evolving, Ms. Sherry
(18) Granger.
(19)    Q.    Let's do it this way:
(20) Who were the board members at the time
(21) that Ms. Bowers worked for AAPCI?
(22)    A.    Ms. Sherry Granger, Ms. Bernadette
(23) Parker, Mr. Andy Alege.
(24)    Q.    That is it?
(25)    A.    Yes.

(1)
(2)    Q.    Three board members?
(3)    A.    Yes.
(4)    Q.    How do you know Sherry Granger?
(5)    A.    Seeking funding from a bank, I believe it
(6) was Chase at the time, we inquired about getting some
(7) funding.
(8) What we wanted Chase was not doing at the
(9) time, the funding that we wanted, Chase was not doing
(10) at the time.
(11) Ms. Granger inquired what the
(12) organization is. We told her what services we
(13) provide, and asked if she would be interested in
(14) doing something for the community.
(15) She said it was something she would
(16) consider. She would get back to us.
(17) Eventually, she got back to us, and said
(18) okay, and that is how she got on the board.
(19)    Q.    When was the board expanded from three
(20) members to nine?
(21)    A.    I don't remember.
(22) It was a gradual process. I don't
(23) recall.
(24)    Q.    Were there some interim numbers, that it
(25) went from three to five or six or seven or eight or

(1)
(2) something in between before it went to nine, or did
(3) it go from three directly to nine?
(4)    A.    Gradually.
(5)    Q.    Why did you expand the number of board
(6) members?
(7)    A.    Because the bylaws allow you to expand
(8) the number of board members.
(9)    Q.    I understand the bylaws may allow it. I
(10) have not seen the bylaws.
(11) I am asking why you did it.
(12)    A.    Because different board members have
(13) different things to bring to the board, different
(14) talents, different expertise.
(15)    Q.    Did you do anything to prepare for your
(16) deposition today?
(17)    A.    I read or updated myself with
(18) Ms. Bowers's personnel file.
(19)    Q.    Did you read anything else?
(20)    A.    No.
(21)    Q.    Has everything in that personnel file
(22) been turned over to your lawyer for production to me
(23) in this lawsuit?
(24)    A.    Yes.
(25)    Q.    How do you know that?

(1)
(2)    A.    How do I know if everything was given to
(3) him?
(4)    Q.    Right.
(5) Did you do it yourself?
(6)    A.    Right.
(7)    Q.    Other than reading Ms. Bowers's personnel
(8) file, did you do anything else to prepare for your
(9) deposition here today?
(10)    A.    No.
(11)    Q.    Did you meet with your lawyer?
(12)    A.    Yes.
(13)    Q.    When?
(14)    A.    I believe it was yesterday.
(15)    Q.    How long did you spend with him?
(16)    MR. WHITMAN:    Let me caution you not
(17) to reveal the content of anything that was
(18) discussed.
(19)    Q.    I am not going to ask you anything
(20) about the content that was discussed.
(21) When you say your lawyer, I assume that
(22) you mean Mr. Whitman, who is sitting next to you
(23) today?
(24)    A.    Yes.
(25)    Q.    How long did you spend meeting with

Page 85

(1)
(2)  Mr. Whitman yesterday?
(3)      A.    An hour. Maybe more. I don't recall. I
(4)  was not wearing a watch.
(5)      Q.    Your best guess is that it was
(6)  approximately an hour?
(7)      A.    Maybe more than an hour.
(8)      Q.    Did you review any documents?
(9)      A.    No.
(10)     Q.    When did you read Ms. Bowers's personnel
(11) file in preparation for this deposition?
(12)     A.    Maybe Tuesday or Wednesday, I believe.
(13)     Q.    How long did it take you to read the
(14) file?
(15)     A.    I don't recall.
(16) I just kind of glanced through it,
(17) through the different memos, things like that.
(18)     Q.    Do you recall any specific memos that you
(19) looked at?
(20)     A.    No.
(21)     Q.    Not at all?
(22)     A.    No.
(23)     Q.    Did you talk to anyone other than your
(24) lawyer about your testimony here today?
(25)     A.    My board.

Page 86

(1)
(2)      Q.    When did you speak with someone from the
(3)  board about your testimony here today?
(4)      A.    I believe I told my board chair last
(5)  night that I would be coming here this morning,
(6)  yesterday afternoon probably, trying to get your
(7)  address, I said that I would be here today.
(8)  That is about it.
(9)      Q.    Anyone else?
(10)     A.    No.
(11)     Q.    Did you have any discussions with anyone
(12) at AAPCI, that is, or Serenity House, any other
(13) employees, about your deposition here today?
(14)     A.    I told my staff that there would be two
(15) people – three people, I'm sorry, who would be
(16) deposed, I guess based on the conversations.
(17)     MR. WHITMAN:    He is asking about your
(18) deposition today.
(19)     A.    No.
(20)     Q.    Who were the three people that you told
(21) would be deposed?
(22)     A.    Ms. Lee, Ms. Pipkins, Ms. Dobson.
(23)     Q.    What about the facts and circumstances of
(24) this case, when was the last time that you spoke to
(25) any of the employees at AAPCI or Serenity House about

Page 87

(1)
(2)  the facts and circumstances of this case?
(3)      MR. WHITMAN:    Objection to the form.
(4)      Q.    You can answer.
(5)      A.    The facts and circumstances?
(6)  I spoke to those three individuals that I
(7)  previously mentioned. I told them that they would be
(8)  deposed.
(9)  They wanted to know why. I told them I
(10) could not really get into too much detail.
(11)     Q.    Do they know that there is a lawsuit in
(12) progress?
(13)     MR. WHITMAN:    Objection.
(14) It calls for speculation.
(15)     A.    I don't know if they know that there
(16) is a lawsuit, or they know that you are probably
(17) going to be deposing them. That is all that I could
(18) really tell them. I could not tell them much about
(19) the case.
(20)     Q.    Did you tell them that you were being
(21) sued?
(22)     A.    I told them that I am having a deposition
(23) regarding Ms. Bowers. That was it.
(24) They wanted to know why. I said that I
(25) cannot go into detail.

Page 88

(1)
(2)      Q.    You told them that you cannot go into
(3)  detail?
(4)      A.    Yes.
(5)      Q.    Other than just in connection with this
(6)  deposition, did you speak to them about Ms. Bowers,
(7)  and the fact that there is a lawsuit, and the facts
(8)  and circumstances thereof?
(9)      A.    No.
(10)     Q.    What did you tell Ms. Pipkins about why
(11) she was going to be deposed?
(12)     MR. WHITMAN:    Objection to the form.
(13)     Q.    You can answer.
(14)     A.    I told Ms. Pipkins our attorney will
(15) contact her one way or the other and he will tell
(16) her.
(17)     Q.    Is that it?
(18)     A.    That is it.
(19)     Q.    Other than that conversation, when is the
(20) last time that you had any discussion with
(21) Ms. Pipkins that had anything to do with Ms. Bowers?
(22)     A.    I don't recall.
(23)     Q.    Ms. Bowers stopped working at AAPCI in
(24) October of 2006; is that correct?
(25)     A.    I don't know when she stopped working. I

Page 89

(1)
(2) don't have her folder. I don't know.
(3)    Q.    Since she stopped working there, have you
(4) discussed her with Ms. Pipkins?
(5)    A.    Since she stopped working there?
(6)    Q.    Yes.
(7)    A.    No.
(8)    Q.    What about Ms. Lee, have you discussed
(9) Ms. Bowers with Ms. Lee since Ms. Bowers left working
(10) at AAPCI?
(11)    A.    No.
(12)    Q.    The same question for Ms. Dobson.
(13)    A.    No.
(14)    Q.    What about the facts and circumstances of
(15) this lawsuit, have you ever discussed the facts and
(16) circumstances of this lawsuit with Ms. Pipkins,
(17) Ms. Lee, or Ms. Dobson?
(18)    A.    No.
(19)    Q.    Tell me about how you came to meet
(20) Ms. Bowers.
(21)    A.    We had just opened Serenity House. I
(22) don't remember the year.
(23) The city and the state were there. We
(24) were giving a tour of the facility.
(25) Certain things in child care were needed,

Page 90

(1)
(2) like tables, chairs, things like that. The state
(3) advised me to – well, first, we received tons of
(4) donations – furniture, tables, chairs, things like
(5) that – from Chase.
(6) The state came over. It was fine. They
(7) felt that the equipment, the furniture in child care,
(8) was inadequate. They suggested that I talk to some
(9) of my colleagues in the neighborhood, being mainly
(10) other shelter providers.
(11)    Q.    Just to get an idea of where you are, had
(12) Serenity House taken any residents at that point or
(13) not?
(14)    A.    I don't believe it had any residents at
(15) that point.
(16)    Q.    To your best estimate, when is the first
(17) year that the first resident, the first person came
(18) to be at Serenity House that was provided any sort of
(19) services by Serenity House?
(20)    A.    My best guess?
(21)    Q.    Yes.
(22)    A.    2005.
(23)    Q.    Am I correct, then, that AAPCI, the
(24) corporation, was formed in approximately 1996; is
(25) that correct?

Page 91

(1)
(2)    A.    Correct.
(3)    Q.    Serenity House opened, I think that you
(4) said, in 2000; is that correct?
(5)    A.    I do not recall when it opened.
(6) As I recall, we were still building the
(7) place.
(8)    Q.    Did you build the building from scratch,
(9) or did you buy it from somewhere?
(10)    A.    We built it from scratch.
(11)    Q.    When was the building completed,
(12) construction?
(13)    A.    I believe, my best guess, November 2004
(14) is when we were given the keys.
(15) That is my best guess. I could be wrong.
(16) It could be a year before.
(17)    Q.    Now we are talking in approximately 2005
(18) you had your first resident, approximately?
(19)    A.    Okay.
(20)    Q.    Is that correct?
(21)    A.    I don't know. I don't remember when we
(22) had the first client, but I think approximately.
(23)    Q.    I am just asking you whether it's correct
(24) that it was approximately 2005 when that happened.
(25)    A.    Approximately.

Page 92

(1)
(2)    Q.    So now you are talking about Chase Bank
(3) had given you tons of donations and furniture and the
(4) city or the state is touring?
(5)    A.    Correct.
(6)    Q.    What happened next?
(7)    A.    The furniture was not adequate for child
(8) care.
(9)    Q.    Who said that?
(10)    A.    The state.
(11) The tables were a little bit too high.
(12) The chairs were a bit too high.
(13) "Talk to your colleagues in the
(14) neighborhood."
(15) They gave me three other shelters that
(16) surround the facility, the names of three other
(17) shelters, one of them being UCC.
(18)    Q.    What does that stand for?
(19)    A.    Urban Center for Change, I believe.
(20) I contacted the CEO of UCC and he came
(21) and got a tour. He liked the place. It was a
(22) brand-new facility.
(23)    Q.    Who was that? What was his name?
(24)    A.    His name skips my mind right now.
(25) He looked around the child-care area and

#### Page 93

(1)
(2) said, "You're almost there. There are a couple of
(3) things that you need.
(4) "What I will do is, I will have my
(5) shelter director call you. You guys can set up an
(6) appointment. She will come over, take a look, and
(7) see if we can help you out."
(8) Her name was Sondra Jackson. I made an
(9) appointment with Sondra Jackson.
(10)     Q.   Had you ever met or heard of Sondra
(11) Jackson before then?
(12)     A.   No.
(13)     Q.   Continue.
(14)     A.   Sondra calls me. We set up a date.
(15) Sondra says, "I will bring my assistant director with
(16) me, and I will bring my child-care" -- whatever her
(17) title was over there -- "child-care supervisor with
(18) me."
(19) I said, "Fine."
(20)     Q.   The child-care supervisor that you are
(21) referring to is Ms. Bowers, correct?
(22)     A.   That is correct.
(23) Being a domestic violence shelter, people
(24) have to be announced to come to the building. I
(25) never met Ms. Jackson before. I didn't know what she

#### Page 94

(1)
(2) looked like.
(3) They show up at the facility,
(4) Ms. Jackson, Ms. Bowers, and Ms. Forte, they show up
(5) at the facility, and I am called outside by security.
(6) They said, "Mr. Okebiyi, you have visitors outside."
(7) Ms. Pipkins and I go outside to meet our
(8) visitors.
(9) Again, we had never met them before.
(10) I stepped outside. Ms. Jackson said,
(11) "Matthew?"
(12) I said, "Yes."
(13) She said, "Hi. I am Sondra Jackson."
(14) "Hi. Nice to meet you."
(15) "This is Angell Bowers."
(16) "Hi. Nice to meet you."
(17) "This is Ms. Forte." I don't remember
(18) her first name.
(19) "Hi. Nice to meet you. This is Gladys
(20) Pipkins."
(21) We made introductions and that was that.
(22) I am talking to Ms. Jackson throughout
(23) the entire conversation because my business is with
(24) her, not with the other two people. I don't really
(25) know them.

#### Page 95

(1)
(2) That is when we began the discussion.
(3)     Q.   Did you take them inside of the facility?
(4)     A.   Yes.
(5)     Q.   What did you do when you got inside of
(6) the facility?
(7)     A.   We go in. The first thing I did is give
(8) them a tour.
(9) The first thing when you enter the
(10) facility is there is a security desk. Everybody is
(11) looking around. Again, it's a brand-new facility.
(12) They are impressed. Everybody said, "Wow, this is
(13) larger than our facility. The cameras are larger
(14) than our cameras," and so on and so forth.
(15) We show them the security area, and we
(16) begin to give them a tour of the first floor, the
(17) case manager's office.
(18) We ended up in child care, the child-care
(19) space, a large space, and Ms. Bowers looks around and
(20) says, "Wow, this is bigger than our child-care
(21) space."
(22) I believe we had some staff members there
(23) already, a handful. I don't know how many exactly.
(24) The first question Ms. Bowers asked is,
(25) "So who is the child-care coordinator?"

#### Page 96

(1)
(2) I said, "We don't have one."
(3) She said, "Yes you do now."
(4) So Ms. Pipkins and I looked at each
(5) other, and Sondra is standing next to me, and I
(6) looked at Sondra.
(7) She said, "How much does it pay?" and I
(8) told her.
(9)     Q.   Who said, "How much does it pay"?
(10)     A.   Ms. Bowers.
(11) She said, "This job is for me."
(12) I looked at Sondra and I said, "Is she
(13) serious?"
(14) Sondra responded, "She is very serious."
(15) Gladys and I looked at each other, wow,
(16) okay.
(17)     Q.   So it is your testimony, then, that it
(18) was Ms. Bowers who offered her services initially as
(19) an employee for AAPCI and Serenity House?
(20)     A.   There is no doubt about it.
(21)     Q.   Continue.
(22) MR. WHITMAN:   Continue what?
(23) MR. LEFKOWITZ:   He was giving a
(24) narrative of what happened the first time
(25) they met.

Page 97

(1)
(2)    Q.    Have you completed your answer?
(3)    A.    As to how we met, yes.
(4)    Q.    When she offered her services as an
(5)    employee, did you give her an answer right away?
(6)    A.    No.
(7)    Q.    What did you tell her?
(8)    A.    Nothing.
(9)    We were in shock because the purpose of
(10)    the visit was to look at child care and see if we had
(11)    the right furniture.
(12)    "Since you guys operate a domestic
(13)    violence shelter, tell us what we are doing wrong, if
(14)    anything," so to say that you want a job, and
(15)    especially with your boss there –
(16)    Q.    Did Ms. Jackson seem like she knew it was
(17)    going to happen, or was it a surprise to her as well?
(18)    MR. WHITMAN:    Objection.
(19)    It calls for speculation.
(20)    A.    I don't know.
(21)    Q.    Was that the end of the meeting, or did
(22)    something else happen on that occasion?
(23)    A.    Regarding any one of them or Ms. Bowers
(24)    specifically?
(25)    Q.    Regarding any one of them at that initial

Page 98

(1)
(2)    meeting.
(3)    A.    We continued the tour.
(4)    Q.    After you finished that initial meeting
(5)    with everybody, when everybody was leaving, how did
(6)    you leave it with Ms. Bowers regarding the job?
(7)    A.    With Ms. Bowers, a phone call came in
(8)    from the city. I took the phone call. The tour had
(9)    not ended yet.
(10)    I said, "Ms. Pipkins, please continue the
(11)    tour. When you guys are done, I will be in my office
(12)    taking this phone call."
(13)    They came back after the tour and I was
(14)    still on the phone.
(15)    The first person into my office was
(16)    Ms. Bowers.
(17)    "Wow, Mr. Okebiyi, nice place. I really
(18)    want to work here. I want that job."
(19)    "Here is my business card. Send us your
(20)    resume. We will see."
(21)    Q.    You gave her your business card?
(22)    A.    Yes.
(23)    She steps out.
(24)    Ms. Forte comes in, the assistant
(25)    director, "Wow, nice place. I want to work here."

Page 99

(1)
(2)    Q.    Ms. Forte asked to work there, too?
(3)    A.    Yes.
(4)    "Here is my business card. Send us your
(5)    resume. We will see."
(6)    Q.    Again, it is your testimony that
(7)    Ms. Forte is the one that brought up the subject of
(8)    her working there, it was not the other way around?
(9)    A.    Correct.
(10)    She steps out.
(11)    Sondra steps into my office.
(12)    "Matthew, nice place, really nice place.
(13)    You started this organization?"
(14)    I said, "Well, kind of, yes."
(15)    "Did the state give you the money?"
(16)    "Well, they did not give it to me
(17)    personally. It's not my money. It is the
(18)    organization's money."
(19)    "Well, I have been trying to start my own
(20)    nonprofit for a long time, and I am having problems."
(21)    "Here is my business card. When you get
(22)    some time, give me a call. I will see if I can help
(23)    you out."
(24)    She said, "Okay."
(25)    That was the end of the meeting.

Page 100

(1)
(2)    We walked them outside, myself, Gladys,
(3)    Ms. Forte, Sandra Jackson, Ms. Bowers. We were
(4)    milling around the front of the building for a few
(5)    more minutes, making some more idle talk. I am
(6)    talking to Ms. Sondra Jackson. Ms. Pipkins is
(7)    talking to Ms. Forte and Ms. Bowers.
(8)    I am embarrassed. I said to Sondra, "Did
(9)    you hear what your employees said?"
(10)    She said, "I heard them."
(11)    "Sondra, you are my colleague. I am not
(12)    trying to steal your employees. You heard what they
(13)    said."
(14)    She said, "Yes, I heard them. If they
(15)    want to leave, let them leave. I wish them the
(16)    best."
(17)    I said, "Don't say I stole your
(18)    employees. That is why I am bringing this up to
(19)    you."
(20)    She said, "Matthew, I heard them."
(21)    I said, "Okay."
(22)    That was that.
(23)    "Nice meeting you guys. See you later."
(24)    That was that.
(25)    Q.    When is the next time that you had any

Page 101

(1)
(2) contact with Ms. Bowers after that initial meeting?
(3)     A.    Ms. Bowers sent in her resume.
(4)     Q.    By mail?
(5)     A.    No, fax.
(6)     Q.    She faxed you her resume?
(7)     A.    Yes.
(8)     Q.    How soon after the original meeting?
(9)     A.    I don't recall.
(10)     Q.    Was it a matter of days, weeks, months?
(11)     A.    I don't recall because Ms. Bowers was not
(12) the person we were thinking about. She was the last
(13) person on our mind.
(14) Dr. Cowin is the person we wanted for the
(15) job.
(16)     Q.    Ms. Bowers faxed you her resume?
(17)     A.    Yes.
(18)     Q.    What did you do with the resume?
(19)     A.    I gave it to Gladys, as I always do, I
(20) would give it to Gladys to review.
(21)     Q.    What is the name of the other person that
(22) you were considering?
(23)     A.    Dr. Cowin.
(24)     Q.    What is her first name?
(25)     A.    Jazmin Cowin.

Page 102

(1)
(2)     Q.    Would you spell her name, please.
(3)     A.    J-a-z-m-i-n, and I believe it's C-o-w-i-n
(4) or e-n, I am not sure.
(5)     Q.    You are referring to her title as "Dr."
(6) Do you know what she has a doctorate in?
(7)     A.    Early childhood education, I believe.
(8)     Q.    After Ms. Bowers faxed you her resume,
(9) what was the next contact that you had with
(10) Ms. Bowers?
(11)     A.    The next contact with Ms. Bowers was
(12) to – her resume came in. We couldn't afford
(13) Dr. Jazmin Cowin. An interview was set up with
(14) Ms. Bowers.
(15)     Q.    So because Ms. Cowin was asking for a
(16) salary that was more than you wanted to pay, you
(17) looked to Ms. Bowers; is that correct?
(18)     A.    Not more than what I wanted to pay, it
(19) was more than the budget allowed or the city and the
(20) state had approved.
(21)     Q.    Fair enough.
(22) When did you make the determination that
(23) Dr. Cowin was requesting too much money?
(24)     A.    When did I make that determination?
(25) When we talked, and she asked how much

Page 103

(1)
(2) the salary is, and we told her. She said she could
(3) not work for that.
(4)     Q.    Did you already have Ms. Bowers's resume
(5) at the time, or did you receive Ms. Bowers's resume
(6) at some time after that?
(7)     A.    At some time after that.
(8)     Q.    Your meeting with Dr. Cowin in which you
(9) realized that you were not going to be able to come
(10) to financial terms, was that before or after you met
(11) initially with Ms. Bowers and Ms. Jackson and
(12) Ms. Forte and had that tour?
(13)     A.    Before.
(14)     Q.    So at the time that you met with
(15) Ms. Jackson and Ms. Bowers and Ms. Forte, and Gladys
(16) Pipkins was there, you already knew that Dr. Cowin
(17) was asking for more money than you would be able to
(18) pay?
(19)     A.    It was not just the money, but that is
(20) correct, yes.
(21)     Q.    What is the next contact that you had of
(22) any kind with Ms. Bowers after she sent you her
(23) resume?
(24)     MR. WHITMAN:    You mean him personally,
(25) or with the organization?

Page 104

(1)
(2)     Q.    Let's talk about you personally.
(3)     A.    None.
(4)     Q.    Well, she came to work at the company at
(5) some point, right?
(6)     A.    Your question is, when did I –
(7)     Q.    When is the next time that you had any
(8) contact with Ms. Bowers after she sent you her
(9) resume?
(10)     A.    The interview, when she came for the
(11) interview.
(12)     Q.    How long after her sending you your resume
(13) did you have the interview?
(14)     A.    I don't recall.
(15)     Q.    How was the interview set up? Did you
(16) call her? Did she call you? Did Ms. Pipkins call
(17) her? How did it happen?
(18)     A.    I don't recall how it happened.
(19)     Q.    Somehow Ms. Bowers got on your schedule;
(20) is that so?
(21)     A.    Yes.
(22)     Q.    Do you have a diary or a book or
(23) Microsoft Office on your computer with a schedule on
(24) it?
(25)     A.    No.

Page 105

(1)
(2) When visitors come in, there is a logbook
(3) that they sign when they come in.
(4)      Q.    I am not talking about that. I am
(5) talking about your schedule.
(6) How did she get on your schedule? How
(7) did you know that on that particular date and time
(8) that you could expect Ms. Bowers to come in for a job
(9) interview?
(10)     A.    It would probably not be on my schedule.
(11) It would be on Gladys's schedule. She would let me
(12) know on such and such a date we have this person
(13) interviewing for this position, John is interviewing
(14) for that job, this person is interviewing for this
(15) position, and I would make myself available to help
(16) Gladys during the interview.
(17)     Q.    When Ms. Bowers came in and you met her
(18) for the job interview, had she already met with
(19) Ms. Pipkins, or did she meet with you first?
(20)     A.    I have no idea.
(21) She comes in. She signs in.
(22)     Q.    You don't know whether she first met with
(23) Ms. Pipkins?
(24)     A.    No.
(25) From five years ago, I don't remember.

Page 106

(1)
(2)      Q.    Had you reviewed Ms. Bowers's resume
(3) before meeting with her for that job interview?
(4)      A.    Probably.
(5)      Q.    Did you determine that Ms. Bowers had the
(6) educational experience that you were going to need?
(7)      MR. WHITMAN:    Objection to the form.
(8)      Q.    You can answer.
(9)      A.    We determined that we were going to
(10) interview Ms. Bowers. We had not received any more
(11) applicants for the position other than Dr. Cowin.
(12) That was the only one that came in.
(13) She visited the facility. She appeared
(14) to be knowledgable of child care. She seemed to have
(15) the appropriate education. She was interviewed.
(16)     Q.    Did you look at her resume and determine
(17) that she was qualified for the position?
(18)     A.    Looking at her resume was not the
(19) determining factor.
(20)     Q.    Did her resume have her educational
(21) experience or her educational background on it?
(22)     A.    Yes.
(23)     Q.    So you saw it and read it, you knew her
(24) educational background, correct?
(25)     A.    Correct.

Page 107

(1)
(2)      Q.    Her resume also had her prior work
(3) experience on it; isn't that so?
(4)      A.    Yes.
(5)      Q.    Did you determine, based upon her
(6) education and work experience, that she was qualified
(7) and you wanted to interview her?
(8)      A.    No, that was not it.
(9)      Q.    What was it?
(10)     A.    What it was is simply this:
(11) We had a mandate from the state to fill a
(12) position because it was vacant.
(13) It's a line-item budget. If you don't
(14) fill in the position, you will lose your funding.
(15) So Ms. Bowers came. She got a tour. We
(16) received her resume. She had worked in a DV facility
(17) before. She had worked with children before.
(18) Fine, stick her in there. Now we have
(19) filled the position in.
(20) That is how Ms. Bowers got the job.
(21)     Q.    Would you have given her the job if she
(22) was not qualified for it?
(23)     A.    No.
(24)     Q.    So you determined, based on her resume
(25) and the job interview, that she was qualified for the

Page 108

(1)
(2) job?
(3)      A.    And based on what the state told us, yes.
(4)      Q.    What did the state tell you?
(5)      A.    "Fill in the position."
(6)      Q.    I am not talking about that now.
(7) I am just talking about whether she was
(8) qualified for the job.
(9) You looked at her resume, and you had a
(10) job interview with her, and you made the
(11) determination that she had the educational background
(12) and work experience, and you made the determination
(13) that she was qualified for the job?
(14)     A.    Ms. Pipkins made the determination.
(15)     Q.    Ms. Pipkins made the determination?
(16)     A.    Yes.
(17)     Q.    Did you also make that determination?
(18)     A.    No.
(19)     Q.    No?
(20)     A.    No.
(21)     Q.    Who made the decision to hire Ms. Bowers?
(22)     A.    Ms. Pipkins.
(23) She discussed this with me. We
(24) interviewed her.
(25) Every supervisor is given the opportunity

Page 109

(1)
(2) to interview their own staff.
(3)    Q.   Certainly.
(4)    A.   So Ms. Pipkins said, "Matthew, what do
(5) you think?"
(6) I said, "Well, she has the education and
(7) the experience from her previous jobs, and it will
(8) satisfy the state to have somebody in that position."
(9)    Q.   Is Ms. Pipkins authorized, or does she
(10) have the power to hire or fire somebody without your
(11) approval?
(12)    A.   Yes.
(13)    Q.   In this case, did she hire Ms. Bowers
(14) without your knowledge or approval?
(15)    A.   No, she told me.
(16)    Q.   Did you approve it?
(17)    A.   Yes.
(18)    Q.   What was the job that Ms. Bowers was
(19) hired for?
(20)    A.   She was hired as the coordinator of child
(21) care and recreational services.
(22)    Q.   Did she maintain that same position
(23) throughout her time there, or did the position change
(24) at any point?
(25)    A.   I don't understand what you mean, when

Page 110

(1)
(2) you say, "change."
(3)    Q.   Was she given another title at some
(4) point? Did she get a promotion or a demotion at some
(5) point or anything like that?
(6)    A.   No.
(7)    Q.   She always kept the same position?
(8)    A.   Correct.
(9)    Q.   From the day she started to the day she
(10) stopped?
(11)    A.   Correct.
(12)    Q.   What were her duties?
(13)    A.   Overseeing the child-care department.
(14) If I have to be specific – I don't have
(15) a job resume in front of me.
(16)    Q.   When you say, "job resume," you are
(17) talking about a job description?
(18)    A.   A job description, I am sorry.
(19)    Q.   You are saying that there is a formal job
(20) description in existence?
(21)    A.   Yes.
(22)    Q.   That job description would be what her
(23) job duties would be, a written-down description?
(24)    A.   Yes.
(25)    Q.   Are there any duties that she would have

Page 111

(1)
(2) that would not be on that written-down description?
(3)    A.   The only thing she would be doing is
(4) wherever was within the purview of the child-care
(5) coordinator,
(6) Anything else, no.
(7)    Q.   You just said there was a written
(8) description of what her job duties were?
(9)    A.   A job description.
(10)    Q.   A job description?
(11)    A.   Yes.
(12)    Q.   My question to you is, did her duties
(13) encompass anything that would not be listed on that
(14) job description?
(15)    MR. WHITMAN:   I will object to the form,
(16) to the extent that you are asking him about –
(17)    MR. LEFKOWITZ:   It's his company.
(18)    MR. WHITMAN:   – something that may be
(19) in a document that is not before him.
(20)    MR. LEFKOWITZ:   All right.
(21) Now that you have coached the witness,
(22) he can answer.
(23)    MR. WHITMAN:   I did not coach the
(24) witness.
(25)    A.   I still do not understand your

Page 112

(1)
(2) question.
(3) I would never ask her to be the
(4) accountant, if that is what you are asking.
(5)    MR. LEFKOWITZ:   Off the record.
(6) (Discussion off the record.)
(7) (Luncheon recess: 12:30 p.m.)
(8)
(9)
(10)
(11)
(12)
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

(1)
(2) A F T E R N O O N S E S S I O N:
(3)    (1:15 p.m.)
(4) M A T T H E W O K E B I Y I, resumed and
(5) testified as follows:
(6) CONTINUED EXAMINATION
(7)    BY MR. LEFKOWITZ:
(8)    Q.    Who was Ms. Bowers's direct supervisor at
(9) AAPCI?
(10)    A.    Ms. Pipkins. She was the assistant
(11) director.
(12)    Q.    Did you also supervise Ms. Bowers on a
(13) day-to-day basis?
(14)    A.    Not on a day-to-day basis.
(15) I mean, if she asked me a question, I
(16) would respond.
(17)    Q.    Are you saying that you did not have much
(18) contact with Ms. Bowers on a day-to-day basis?
(19)    A.    I mean, I would go to child care, "How is
(20) everything going? How is it going?" things like
(21) that.
(22)    Q.    How often, during the course of a typical
(23) day, would you have occasion to see or interact with
(24) Ms. Bowers?
(25)    A.    I try to make it my business when I come

(1)
(2) into the facility in the morning to go to every
(3) department, "Good morning. How is everybody doing?"
(4) that type of thing, "How is child care? How are the
(5) kids? How are the employees doing?"
(6)    Q.    Aside from that, how often would you have
(7) occasion to communicate with Ms. Bowers?
(8)    A.    I was not her direct supervisor, so most
(9) of her communications were with Ms. Pipkins.
(10) With me, if you hear a child screaming in
(11) child care, you go to child care and see what is
(12) going on, that type of thing.
(13)    Q.    Your testimony is that on a day-to-day
(14) basis you did not have a lot of interaction with
(15) Ms. Bowers?
(16)    A.    No.
(17) The only time I had interaction with
(18) Ms. Bowers – and it was not by herself – I would
(19) have what we call general staff meetings, just for
(20) the supervisors, and Ms. Bowers was there,
(21) Ms. Pipkins, all of the supervisors. I met with them
(22) maybe every other day, sometimes daily, sometimes
(23) every three days. I would discuss things.
(24) I may have seen something on TV regarding
(25) domestic violence. I will discuss it with the group.

(1)
(2) You hear something about a child being
(3) abducted, you would share it with the group; you get
(4) opinions; that type of meeting.
(5)    Q.    You were present when Ms. Bowers was
(6) deposed, correct?
(7)    A.    Yes.
(8)    Q.    Do you remember her testimony that
(9) frequently you called her into your office to talk
(10) about various things; do you remember the testimony
(11) that she gave to that effect?
(12)    A.    Yes.
(13)    Q.    Do you agree with that testimony or do
(14) you disagree with that testimony?
(15)    A.    I disagree.
(16)    Q.    What do you disagree with?
(17)    A.    That I would call her frequently into my
(18) office to discuss issues with her.
(19)    Q.    Do you disagree that it happened at all,
(20) or do you disagree with the frequency?
(21)    A.    I don't disagree with the fact that she
(22) would come to my office, but when I met with her
(23) there was somebody else there, her supervisor.
(24)    Q.    Was there always somebody else there?
(25)    A.    There was always somebody else there.

(1)
(2)    Q.    When she came to the office, would it be
(3) a result of you calling her or her coming there on
(4) her own for some reason?
(5)    A.    Initially, it was her coming to my
(6) office.
(7) Gradually, it became meetings with her
(8) and her supervisor.
(9)    Q.    Meaning Ms. Pipkins?
(10)    A.    Yes.
(11)    Q.    What is the reason for Ms. Bowers's
(12) termination?
(13)    A.    She was terminated for cause.
(14)    Q.    For cause?
(15)    A.    Yes.
(16)    Q.    What was the cause that led you to
(17) terminate her?
(18)    A.    I didn't terminate her.
(19)    Q.    Who did?
(20)    A.    Her supervisor.
(21)    Q.    Did you have any input into the decision
(22) to terminate her?
(23)    A.    No.
(24)    Q.    None at all?
(25)    A.    No.

Page 117

(1)
(2)    Q.    Well, then, what was the reason why
(3) Ms. Pipkins terminated her?
(4)    A.    A variety of conditions, things had been
(5) accumulating.
(6) The last reason, if I remember, if I
(7) recollect, was an incident involving a resident whose
(8) child was being abused by another resident.
(9) It is my recollection that Ms. Bowers's
(10) input was sought by the resident and the staff,
(11) child-care staff, and Ms. Bowers threw her hands up
(12) and said, "I don't deal with child-care issues. You
(13) go deal with it," and the resident was very upset.
(14)    Q.    Who was the resident?
(15)    A.    I don't remember her name.
(16)    Q.    I think that you testified that it is
(17) your understanding that this is what happened.
(18) Is that because you were not there, and
(19) did not actually see it, and you were told this by
(20) somebody else?
(21)    A.    It's because when I returned to the
(22) facility that is what the resident told me.
(23) I asked them what happened and the
(24) resident told me.
(25)    Q.    Did Ms. Pipkins consult with you before

Page 118

(1)
(2) Ms. Bowers was terminated?
(3)    A.    I don't think so.
(4)    Q.    You are saying that you reported to work
(5) one day and Ms. Pipkins came to you and said, "I
(6) fired Anjell Bowers?
(7)    A.    No.
(8) Actually, I was in a meeting on the day
(9) that it occurred.
(10) When I came back, I was told that
(11) Ms. Bowers had been terminated.
(12)    Q.    First of all, you say that you were told.
(13) Who told you?
(14)    A.    Ms. Pipkins.
(15)    Q.    Did Ms. Pipkins, at that time, tell you
(16) the reason?
(17)    A.    Yes.
(18)    Q.    The reason was this incident with the
(19) resident that you just spoke about?
(20)    A.    That was the last straw, I believe.
(21)    Q.    You are saying that there were other
(22) things?
(23)    A.    For her termination?
(24)    Q.    Yes.
(25)    A.    There were other things that probably led

Page 119

(1)
(2) to it.
(3)    Q.    You said that it was the last straw.
(4)    A.    Yes.
(5)    Q.    What are the other straws, as it were?
(6)    A.    Referring to staff members as "niggers";
(7) a physical altercation with a resident, a fistfight;
(8) every employee that she didn't get along with was
(9) threatened with a lawsuit.
(10) Those are basically some of the things
(11) that I remember.
(12)    Q.    Who did she get into a physical
(13) altercation with?
(14)    A.    A resident.
(15)    Q.    What is their name?
(16)    A.    I don't remember the resident's name.
(17) RQ MR. LEFKOWITZ: I am calling for
(18) production of that resident's name.
(19)    MR. WHITMAN:    Put your request in
(20) writing, and it will be responded to
(21) appropriately.
(22)    Q.    Who were the employees that she did
(23) not get along with?
(24)    A.    The rec staff. The recreation staff.
(25)    Q.    I am looking for names, sir.

Page 120

(1)
(2)    A.    Ms. Spencer, Ms. Swaphia Dorns,
(3) Mr. Perez.
(4) That is all that I can remember right
(5) now.
(6)    Q.    Does Ms. Spencer still work for the
(7) company?
(8)    A.    Yes.
(9)    Q.    Does Ms. Dorns?
(10)    A.    No.
(11)    Q.    When did Ms. Dorns stop working for the
(12) company?
(13)    A.    I don't recall when she stopped working.
(14)    Q.    Was Ms. Dorns fired or did she quit?
(15)    A.    The last instance, she quit.
(16)    Q.    There was a previous instance when she
(17) was an employee and she was fired; isn't that
(18) correct?
(19)    A.    Yes.
(20)    Q.    Does Mr. Perez still work for the
(21) company?
(22)    A.    No.
(23)    Q.    Was he fired or did he quit?
(24)    A.    He quit.
(25)    Q.    When did he quit?

Page 121

(1)
(2)   A.   I don't recall.
(3)   Q.   Of the employees that you are aware of,
(4) who did Ms. Bowers threaten with a lawsuit?
(5)   A.   Ms. Dorns definitely, and Ms. Spencer.
(6)   Q.   Anyone else that you know of?
(7)   A.   None that I recall right now.
(8)   Q.   What would the nature of the lawsuit have
(9) been against Ms. Spencer?
(10)   MR. WHITMAN:   Objection.
(11) It calls for speculation.
(12)   Q.   You can answer.
(13)   A.   Ms. Bowers indicated that Ms. Spencer
(14) didn't like her. Ms. Spencer had tried to befriend
(15) her, but she found out that Ms. Spencer is,
(16) quote-unquote, two-faced.
(17) Ms. Spencer gave her a hard time, and
(18) "I am not going to give in. You are in for a fight.
(19) I will see you in a court of law."
(20)   Q.   She said, "I will see you in a court of
(21) law" regarding those things that you just said or
(22) something else?
(23)   A.   Regarding those things that I just said.
(24)   Q.   Anything in addition to those things that
(25) you just said?

Page 122

(1)
(2)   A.   Not that I recall immediately.
(3)   Q.   Are you aware of whether a lawsuit was
(4) actually filed against Ms. Spencer?
(5)   A.   Not that I know of.
(6)   Q.   Ms. Dorns, what was the nature of the
(7) lawsuit that Ms. Bowers supposedly threatened
(8) Ms. Dorns with?
(9)   MR. WHITMAN:   Objection.
(10) It calls for speculation.
(11)   Q.   You can answer.
(12)   A.   I'm sorry, what was the question?
(13)   Q.   The question was, what was the nature of
(14) the lawsuit that Ms. Bowers threatened Ms. Dorns
(15) with?
(16)   MR. WHITMAN:   The same objection.
(17)   A.   Ms. Bowers accused Ms. Dorns of
(18) stealing money. She accused Ms. Dorns of scratching
(19) her glasses. There was no evidence.
(20)   Q.   How much money did she say was stolen?
(21)   A.   Five dollars.
(22) Ms. Bowers told all of the staff members
(23) to watch out for Ms. Dorns, she is a thief.
(24) Ms. Dorns was very upset.
(25) Ms. Dorns reported – allegedly reported,

Page 123

(1)
(2) filed a complaint with, I guess, federal authorities
(3) or state authorities, and I told Ms. Bowers that –
(4)   Q.   What kind of complaint?
(5)   A.   I think the legal term is probably
(6) "libel."
(7)   Q.   Are you saying that she filed a lawsuit,
(8) that is, Ms. Dorns filed a lawsuit against Ms. Bowers
(9) for libel?
(10)   A.   Ms. Dorns went to the EEOC to file a
(11) complaint against her supervisor, Ms. Bowers, and I
(12) informed Ms. Bowers of this.
(13) Ms. Bowers, in return, said, "Well, if
(14) she files a lawsuit against me, I will countersue
(15) her."
(16) I asked her, "For what?"
(17) "Well, she lied against me, too."
(18) Here we go.
(19)   Q.   Are you aware of whether there was ever
(20) any actual lawsuit filed by Ms. Dorns against
(21) Ms. Bowers?
(22)   A.   I'm not aware of anything.
(23)   Q.   Are you aware of whether there was ever
(24) any lawsuit filed by Ms. Bowers against Ms. Dorns?
(25)   A.   I am not aware of anything.

Page 124

(1)
(2)   Q.   Was there ever a time during Ms. Bowers's
(3) employment at AAPCI when you were pleased or
(4) satisfied with her job performance?
(5) For example, let's just say the first
(6) month of her employment, were you satisfied with her
(7) job performance?
(8)   A.   Again, I am not her supervisor. Her
(9) supervisor would be the person who would be – who
(10) could determine that, not me.
(11)   Q.   So you did not have enough contact with
(12) her on a daily basis in order to express an opinion
(13) as to whether you were satisfied with her job
(14) performance?
(15)   A.   Correct.
(16)   Q.   The question that I just asked you was
(17) with respect to the first month.
(18) Does that apply for the entire time that
(19) Ms. Bowers was an employee at AAPCI?
(20)   A.   No, it does not.
(21)   Q.   Was there ever any time during
(22) Ms. Bowers's employment at the company when you were
(23) satisfied or pleased with her performance?
(24)   A.   When I was personally satisfied with her
(25) performance?

Page 125

(1)
(2)     Q.    You personally, correct.
(3) Obviously, in a week and a half we have
(4) Ms. Pipkins coming in for a deposition, but I am
(5) asking you now.
(6)     A.    I can't answer that. I was not her
(7) supervisor.
(8)     Q.    So, then, is it fair to say that during
(9) the entire time that Ms. Bowers worked at AAPCI you
(10) did not have enough contact with her on a daily basis
(11) or on a work basis in order to express an opinion as
(12) to whether she was doing a good job or a bad job; is
(13) that fair to say?
(14)     A.    No, it's not fair to say.
(15)     Q.    Then correct me, please.
(16)     A.    Based on the numerous memos that I
(17) received from her, I was saddled with responding to
(18) every allegation between her and a staff member.
(19) There was either a fight with a staff
(20) member – when I say a "fight," I mean a verbal
(21) altercation – a complaint about this or that staff
(22) member, a staff member looking to resign and did
(23) resign because they did not want to work with
(24) Ms. Bowers.
(25) We had to deal with that, and it was just

Page 126

(1)
(2) enough already.
(3)     Q.    Did you feel this way about Ms. Bowers
(4) from the beginning of her employment until the end,
(5) or did it start at some point in the middle?
(6)     A.    I think it started with Swaphia.
(7)     Q.    Ms. Dorns?
(8)     A.    Ms. Dorns.
(9)     Q.    When was that?
(10)     A.    That was when Ms. Dorns – this was when
(11) Ms. Bowers probably had just started, within a couple
(12) – during her probation. I know that it was
(13) definitely during her probational period.
(14)     Q.    How long is the probational period?
(15)     A.    Three months.
(16)     Q.    You are saying that within the first
(17) three months you started to be dissatisfied with
(18) Ms. Bowers's performance?
(19)     A.    Yes.
(20)     Q.    The nature of your dissatisfaction
(21) stemmed from your having to read and deal with all of
(22) these memos that you talked about?
(23)     A.    No.
(24) The nature of my dissatisfaction
(25) initially began with supervisory staff who used

Page 127

(1)
(2) rather – what I would classify as very low tactics
(3) to address the subordinate staff.
(4) For example, why would you accuse someone
(5) of stealing money and insist on them being fired when
(6) you didn't see it?
(7)     Q.    "When you didn't see it," is that what
(8) you said?
(9)     A.    Yes, when you did not see it happen.
(10) A supervisor would try to find out "What
(11) is the problem between Swaphia and I?" or their other
(12) staff; talk to them, talk to your staff.
(13)     Q.    That incident with the stealing or the
(14) theft of $5, you viewed it as poor management skills?
(15)     A.    Yes.
(16)     Q.    Is that the start of your dissatisfaction
(17) with the job performance of Ms. Bowers?
(18)     A.    I believe so.
(19)     Q.    You said that was within the first three
(20) months of Ms. Bowers being employed by AAPCI,
(21) correct?
(22)     A.    Correct.
(23) There were other issues as well.
(24)     Q.    Tell me what they are.
(25)     A.    One was the request for time off to

Page 128

(1)
(2) address personal issues during her probation; lots of
(3) time off. That was an issue for us.
(4)     Q.    During her probation?
(5)     A.    Yes.
(6)     Q.    How much time off?
(7)     A.    At least – based on the memo that is in
(8) the personnel file – at least a couple of times a
(9) week she was not at work because of personal issues.
(10)     Q.    You are saying that that was within the
(11) first three months, during her probation?
(12)     A.    During her probation.
(13)     Q.    Let's get a time frame for this now.
(14) She started working with the company in
(15) June of 2005; is that correct?
(16)     A.    I believe so. I don't – I don't have
(17) her file in front of me.
(18)     Q.    And she stopped working with the company
(19) in October of 2006; does that sound correct to you?
(20)     A.    Possibly.
(21)     Q.    So assuming those dates to be correct –
(22) and I understand that you don't have a recollection
(23) at the tip of your tongue right now – we are talking
(24) now about July, August, September, and that would be
(25) of '05, that would be her three-month probationary

Page 129

(1)
(2) period?
(3)    A.    Correct.
(4)    Q.    You are saying that during this
(5) three-month probationary period before September of
(6) 2005, that she requested a lot of time off?
(7)    A.    Correct.
(8)    Q.    Did she request that time off and it was
(9) granted, or did she request it and it wasn't granted,
(10) or did she request it and she took it and she was not
(11) paid for it? What happened? Did she actually take
(12) the time off or did she just request it?
(13)    MR. WHITMAN:    Objection; compound.
(14)    MR. LEFKOWITZ:    It is compound.
(15)    Q.    I will just ask you this:
(16) Did she actually take time off or did she
(17) just request it?
(18)    A.    She took the time off.
(19)    Q.    Was she paid for that time off?
(20)    A.    Yes.
(21)    Q.    Was that time off eventually credited to
(22) vacation time or some other time that she was
(23) entitled to take?
(24)    A.    Can you rephrase that question?
(25)    Q.    Was Ms. Bowers entitled to any paid

Page 130

(1)
(2) vacation as a part of her job?
(3)    A.    Not during her -- as part of her job,
(4) yes, but not during her probation.
(5)    Q.    I understand.
(6) The time off that she took during her
(7) probation, during those three months, was that then
(8) discounted or credited towards the time that she was
(9) entitled to for vacation?
(10)    A.    I'm sorry, I am trying to understand the
(11) question.
(12)    Q.    How much vacation time was Ms. Bowers
(13) entitled to as part of her job?
(14)    A.    I believe at that time it was two weeks'
(15) vacation.
(16)    Q.    That would be two weeks' paid vacation?
(17)    A.    Yes.
(18)    Q.    I am just going to make up a number now.
(19) Let's just say she took three days off
(20) during her probational period.
(21) Were those three days deducted from the
(22) two weeks or not?
(23)    A.    Yes, I believe that they were.
(24)    Q.    So your objection, then, is that she took
(25) time off during her probationary period, not that she

Page 131

(1)
(2) took extra time off; isn't that so?
(3)    A.    No.
(4)    Q.    What is your objection then?
(5)    A.    The objection is that the policy of the
(6) organization is that no time can be taken off during
(7) probation. While you are on probation, we expect you
(8) to come to work on time.
(9) Ms. Bowers had personal issues that she
(10) needed to address. We kept on giving her a full
(11) paycheck, and the time was taken off from her
(12) vacation time.
(13) Her vacation time was totally exhausted.
(14)    Q.    She exhausted her vacation time?
(15)    A.    Yes.
(16)    Q.    Did AAPCI have a set time of day that she
(17) was supposed to work, for example, from 9:00 to 5:00,
(18) or 10:00 to 6:00, or were there some other ways that
(19) an employee could schedule their hours?
(20)    MR. WHITMAN:    Objection.
(21) Are you asking about Ms. Bowers, or
(22) any employee in general?
(23)    Q.    First let's talk about any employee at
(24) AAPCI.
(25) Was there something called -- I have

Page 132

(1)
(2) heard it called "flex time," where so long as an
(3) employee works eight hours, the employer does not
(4) necessarily care whether they come in from 9:00 to
(5) 5:00 or 10:00 to 6:00.
(6)    A.    No, we don't have that. There is no such
(7) thing as flex time. Everyone has a set schedule of
(8) 9:00 to 5:00, or 8:00 to 4:00, or 12:00 to 8:00,
(9) depending upon what shift you are working.
(10)    Q.    So there is a particular shift, and if
(11) you are working that particular shift, there is a set
(12) time that an employee is supposed to be there?
(13)    A.    Correct.
(14)    Q.    And there is a set time that they are
(15) supposed to leave?
(16)    A.    Correct.
(17)    MR. LEFKOWITZ:    Would you mark this
(18) document as Okebiyi Exhibit 1, please.
(19)    (Okebiyi Exhibit 1, two-page document
(20) headed "Serenity House Family Residence,
(21) A Project of the African American Planning
(22) Commission, Job Description," re:
(23) child/recreational care supervisor, Bates
(24) stamped Nos. AAPC 00079 and AAPC 00080,
(25) marked for identification, as of this date.)

Page 133

(1)
(2)     BY MR. LEFKOWITZ:
(3)     Q.    Mr. Okebiyi, I have given you a document
(4) that has been marked as Okebiyi Exhibit 1, which is
(5) two pages, Bates numbered AAPC 79 and AAPC 80.
(6) I am going to ask you whether you have
(7) seen this document before.
(8)     A.    Yes.
(9)     Q.    What is it?
(10)     A.    It's a job description for the child
(11) care, recreational supervisor.
(12)     Q.    Is that the job occupied by Ms. Bowers
(13) while she was working at AAPCI?
(14)     A.    Right, that is the position.
(15)     Q.    Are there any duties that Ms. Bowers
(16) would have in her position which are not included on
(17) this document?
(18)     A.    I can't think of any other duties.
(19)     Q.    I see that you are looking at the first
(20) page.
(21) If you would flip the page, there is a
(22) short bit of language on the second page, too.
(23) I want to be very clear that this
(24) document represents all of the duties that
(25) Ms. Bowers had in her position at AAPCI.

Page 134

(1)
(2)     A.    I would say pretty much.
(3)     Q.    Sitting here now, you can't think of any
(4) duties that are not included on this document; is
(5) that correct?
(6)     A.    If there are, the last line here,
(7) No. 8, that would cover it. It says, "Perform such
(8) other related duties as may be requested by agency
(9) heads."
(10)     Q.    That would be a catch-all, as you say?
(11)     A.    Yes, within the child-care program.
(12)     Q.    Fair enough.
(13)     MR. LEFKOWITZ:    Would you mark this
(14) document as Okebiyi Exhibit 2, please.
(15)     (Okebiyi Exhibit 2, one-page
(16) memorandum on the stationery of African
(17) American Planning Commission, Inc., dated
(18) May 10, 2006, to Anjell Bowers, from Gladys
(19) B. Pipkins, Bates stamped No. 000211, marked
(20) for identification, as of this date.)
(21)     BY MR. LEFKOWITZ:
(22)     Q.    Showing you a document that has been
(23) marked as Okebiyi Exhibit 2, which is a document
(24) bearing Bates No. 211, I am going to ask whether you
(25) have ever seen this before.

Page 135

(1)
(2)     A.    I have not.
(3)     Q.    First of all, do you see the "CC," it
(4) says, "File"?
(5)     A.    Yes.
(6)     Q.    Do you know what file Ms. Pipkins would
(7) be referring to?
(8)     MR. WHITMAN:    Objection.
(9) It calls for speculation.
(10)     A.    No, I don't.
(11) I am assuming, my best guess, in either
(12) Ms. Bowers's file or Ms. Pipkins's file.
(13)     Q.    Would it be a personnel file for
(14) Ms. Bowers?
(15)     A.    It could be.
(16)     Q.    I am noticing that this document was
(17) produced by Ms. Bowers in discovery, but not by you
(18) or AAPCI in discovery.
(19) I am wondering whether this particular
(20) file is something that you overlooked?
(21)     MR. WHITMAN:    Objection to the form.
(22) It lacks foundation.
(23)     Q.    You can answer.
(24)     A.    I have never seen this before.
(25) RQ MR. LEFKOWITZ: I am calling for

Page 136

(1)
(2) production of whatever documents are in this
(3) particular file.
(4) I guess I will have to ask Ms. Pipkins
(5) about that.
(6)     Q.    Does AAPCI maintain personnel files?
(7)     A.    Yes.
(8)     Q.    Did AAPCI maintain a personnel file for
(9) Ms. Bowers?
(10)     A.    Yes.
(11)     Q.    Did AAPCI maintain one general file in a
(12) human resources office of some kind, or, for example,
(13) would Ms. Pipkins have maintained her own file?
(14)     A.    AAPCI maintained one file.
(15)     Q.    You said one file?
(16)     A.    Yes.
(17)     Q.    Do you have any explanation as to why
(18) Exhibit 2 was not in the personnel file and not
(19) turned over in discovery?
(20)     MR. WHITMAN:    Objection.
(21) It lacks foundation.
(22)     Q.    You can answer.
(23)     A.    I have no idea. This is the first time,
(24) too, that I have seen this.
(25)     MR. LEFKOWITZ:    Would you mark this

Page 137

(1)
(2) document as Okebiyi Exhibit 3, please.
(3) (Okebiyi Exhibit 3, two-page letter on
(4) the stationery of African American Planning
(5) Commission, Inc., dated June 22, 2005, to
(6) Anjell Bowers, from Matthew Okebiyi, Bates
(7) stamped Nos. 000326 and 000327, marked for
(8) identification, as of this date.)
(9) BY MR. LEFKOWITZ:
(10) Q. I am showing you a document which has
(11) been marked as Exhibit No. 3, Bates numbered 326 and
(12) 327.
(13) I am going to ask whether you have ever
(14) seen this document before.
(15) A. Yes, I have.
(16) Q. What is it?
(17) A. It's a memo that was written to
(18) Ms. Bowers. She believed she was never late, and she
(19) wanted us to prove, and to list all of the dates that
(20) she had been late, and these are the dates.
(21) Q. First of all, do you see the date at the
(22) top of this?
(23) It says it's dated June 22, 2005.
(24) Do you see that?
(25) A. Yes.

Page 138

(1)
(2) Q. This letter is signed by you, correct?
(3) A. Yes.
(4) Q. Is that your signature on the second
(5) page?
(6) A. Yes, it is.
(7) Q. In looking at the context of this letter
(8) and the content of the letter, it is clear that June
(9) 22, 2005 is an incorrect date; isn't that so?
(10) MR. WHITMAN: Objection to the form.
(11) Q. Let me be more specific.
(12) In the third line down it says, "I stated
(13) to you in a previous memorandum dated June 21,
(14) 2006..."
(15) If you are referring in your letter to
(16) something that happened on June 21, 2006, obviously
(17) this letter was not sent in June of 2005.
(18) Would you agree with that?
(19) A. Okay.
(20) Q. I don't want you to agree with me if you
(21) don't see it.
(22) Do you see what I am talking about?
(23) A. I guess so.
(24) Q. Well, let's look at the list of dates,
(25) then.

Page 139

(1)
(2) The first one is January 4, 2006,
(3) correct?
(4) A. Correct.
(5) Q. So on June 22, 2005, you were not being a
(6) fortune teller and predicting that she was going to
(7) be absent six months later, in January of 2006,
(8) correct?
(9) A. Correct.
(10) Q. So the date of this letter is incorrect,
(11) correct?
(12) A. It could be a typo, yes.
(13) Q. You are saying it could be a typo?
(14) A. Yes, a typo.
(15) Q. Is it a typo?
(16) A. Okay.
(17) Q. I am not trying to belabor the point
(18) here. I thought this was going to be a 30-second
(19) thing; that you were going to look at it and say,
(20) "Oops, it's a typo," and we would move on.
(21) A. It's a typo.
(22) Q. Where did you get these dates that you
(23) list, the dates that she was absent or left early;
(24) where did you get these dates from?
(25) A. From the employee time records.

Page 140

(1)
(2) Q. You did not have these dates off the top
(3) of your head and put them down, you actually got them
(4) from a piece of paper somewhere, from employee time
(5) records, correct?
(6) A. Yes.
(7) RQ MR. LEFKOWITZ: I am calling for
(8) production of those records.
(9) MR. WHITMAN: Put the request in
(10) writing and we will respond appropriately.
(11) MR. LEFKOWITZ: Would you mark this
(12) document as Okebiyi Exhibit 4, please.
(13) (Okebiyi Exhibit 4, one-page letter on
(14) the stationery of African American Planning
(15) Commission, Inc., dated June 7, 2005, to
(16) Anjell Bowers, from Matthew Okebiyi, Bates
(17) stamped No. 000342, marked for identification,
(18) as of this date.)
(19) BY MR. LEFKOWITZ:
(20) Q. I am showing you a document which has
(21) been marked as Exhibit 4, and it's Bates numbered
(22) 342.
(23) Is that your signature, sir?
(24) A. Yes, it is.
(25) Q. This letter, like the others, I am just

Page 141

(1)
(2) confirming that June 7, 2005, which is the date of
(3) this letter, is incorrect.
(4) Would you agree with that, looking at the
(5) context of the language of this letter?
(6) You are taking a little while to answer,
(7) so let me point it out to you.
(8) In the text of the letter you refer to a
(9) "...May 24, 2006 letter titled In My Absence."
(10) If you are referring to a May 2006
(11) letter, obviously, this one that we have in our
(12) hands, Exhibit 4, was not sent a year before, on
(13) June 7, 2005, correct?
(14)    MR. WHITMAN:    Objection.
(15)    A.    Okay.
(16)    Q.    Correct?
(17)    A.    Correct.
(18) It's a typo.
(19)    Q.    We are going to have to go through and
(20) find all of these. I have a stack of about six more
(21) here where you did that.
(22)    MR. WHITMAN:    Is that a question?
(23)    MR. LEFKOWITZ:    No.
(24) Would you mark this document as
(25) Okebiyi Exhibit 5, please.

Page 142

(1)
(2)    (Okebiyi Exhibit 5, two-page letter on
(3) the stationery of African American Planning
(4) Commission, Inc., dated June 8, 2005, to
(5) Anjell Bowers, from Matthew Okebiyi, Bates
(6) stamped Nos. 000045 and 000046, marked for
(7) identification, as of this date.)
(8)    BY MR. LEFKOWITZ:
(9)    Q.    I am showing you what has been marked as
(10) Exhibit 5. It's two pages, Bates numbered 45 and 46.
(11) This letter, like the others, is dated in
(12) June of 2005, but we can tell from the context that
(13) that is an incorrect date; isn't that so?
(14)    MR. WHITMAN:    Objection to the form.
(15)    A.    Correct.
(16)    Q.    My statement is correct, right?
(17)    A.    Yes.
(18)    Q.    June 8, 2005 is not the correct date of
(19) this letter?
(20)    A.    It's a typo.
(21)    Q.    Was there anything significant that
(22) happened in June of 2005 at AAPCI?
(23)    MR. WHITMAN:    Objection to the form.
(24)    A.    That happened when?
(25)    Q.    In June of 2005.

Page 143

(1)
(2) There are a number of these misdated
(3) letters that are dated in June of 2005 that did not
(4) happen in June of 2005.
(5) I am asking you whether anything, to your
(6) recollection, happened at or around that time that
(7) would cause you to date all of these letters in June
(8) of 2005.
(9)    A.    Nothing comes to my recollection.
(10) It was just a typo.
(11)    MR. LEFKOWITZ:    Would you mark this
(12) document as Okebiyi Exhibit 6, please.
(13)    (Okebiyi Exhibit 6, one-page letter on
(14) the stationery of African American Planning
(15) Commission, Inc., dated June 21, 2005, to
(16) Anjell Bowers, from Matthew Okebiyi, Bates
(17) stamped Nos. 000052, marked for identification,
(18) as of this date.)
(19)    BY MR. LEFKOWITZ:
(20)    Q.    I am showing the witness what has been
(21) marked as Exhibit 6. It's Bates numbered 52.
(22) Have you ever seen this document before?
(23)    A.    Yes, I have.
(24)    Q.    That is your signature on the bottom?
(25)    A.    Yes, it is.

Page 144

(1)
(2)    Q.    This document is dated June 21, 2005,
(3) correct?
(4)    A.    Correct.
(5)    Q.    Is that date correct?
(6)    A.    I am assuming that it's correct.
(7)    Q.    Well, did Ms. Bowers work for AAPCI on
(8) June 21, 2005?
(9)    A.    I don't know.
(10) When did she start working for AAPCI?
(11)    Q.    You don't know?
(12)    A.    I don't have her personnel file in front
(13) of me.
(14)    MR. LEFKOWITZ:    Would you mark this
(15) document as Okebiyi Exhibit 7, please.
(16)    (Okebiyi Exhibit 7, two-page letter on
(17) the stationery of African American Planning
(18) Commission, Inc., dated June 7, 2005, to
(19) Anjell Bowers, from Matthew Okebiyi, Bates
(20) stamped No. 000058, marked for identification,
(21) as of this date.)
(22)    BY MR. LEFKOWITZ:
(23)    Q.    Showing you what has been marked as
(24) Exhibit 7, it's Bates numbered 58.
(25) Is that your signature, sir?

Page 145

(1)
(2)    A.    Yes, it is.
(3)    Q.    Do you recognize this letter?
(4)    A.    Yes, I do.
(5)    Q.    You can tell from the context of the
(6)    letter, again, that this letter was not sent on
(7)    June 7, 2005; isn't that so?
(8)        MR. WHITMAN:    Objection to the form.
(9)    A.    That is correct.
(10)    Q.    Again, if you would search your
(11)    recollection, is there anything specific that
(12)    happened in June of 2005 that would cause you to
(13)    date all of these letters June of 2005, when they
(14)    were clearly events that happened about a year
(15)    later?
(16)        MR. WHITMAN:    Objection to the form.
(17)    A.    It's a typo in the year, apparently.
(18)    Q.    In June, six months into the year, you
(19)    are making a typo in the year; that is what your
(20)    testimony is?
(21)    A.    No.
(22)    My testimony is that it's probably a
(23)    typo.
(24)    Q.    Of the year?
(25)    A.    Probably of the year.

Page 146

(1)
(2)    Q.    Most people make that typo in January or
(3)    even in February.
(4)    We are talking six months into the year.
(5)    This letter is dated June of 2005, and
(6)    you were still making that typo?
(7)        MR. WHITMAN:    Objection to the form.
(8)    Q.    Is that your testimony?
(9)    A.    Do you want me to respond?
(10)    Q.    Yes.
(11)    A.    I am sure that that's an error in the
(12)    date, but the content is still the same.
(13)    Q.    So we should trust what you say as to the
(14)    content?
(15)    A.    Yes, sir.
(16)        MR. LEFKOWITZ:    Would you mark this
(17)    document as Okebiyi Exhibit 8, please.
(18)        (Okebiyi Exhibit 8, one-page letter on
(19)    the stationery of African American Planning
(20)    Commission, Inc., dated June 8, 2005, to
(21)    Anjell Bowers, from Matthew Okebiyi, Bates
(22)    stamped No. 00084, marked for identification,
(23)    as of this date.)
(24)        BY MR. LEFKOWITZ:
(25)    Q.    I am showing you what has been marked as

Page 147

(1)
(2)    Exhibit 8. It's a document Bates numbered 84.
(3)    Is that your signature, sir?
(4)    A.    Yes, it is.
(5)    Q.    Again, can we agree that the date of this
(6)    letter, June 8, 2005, is incorrect?
(7)        MR. WHITMAN:    Objection to the form.
(8)    Q.    You can answer.
(9)    I will just refer you to the last line
(10)    of your letter.
(11)    A.    Correct, it's a typo.
(12)    Q.    So we have another June of 2005 date
(13)    which is incorrect?
(14)    A.    Which is a typo, correct.
(15)        MR. LEFKOWITZ:    Would you mark this
(16)    document as Okebiyi Exhibit 9, please.
(17)        (Okebiyi Exhibit 9, one-page letter on
(18)    the stationery of African American Planning
(19)    Commission, Inc., dated June 27, 2005, to
(20)    Anjell Bowers, from Matthew Okebiyi, Bates
(21)    stamped No. 000145, marked for identification,
(22)    as of this date.)
(23)        BY MR. LEFKOWITZ:
(24)    Q.    I am showing you what has been marked as
(25)    Exhibit 9. It's Bates numbered 145.

Page 148

(1)
(2)    Again, it has a date of June 2005. The
(3)    exact date is June 27, 2005.
(4)    That date, based upon the context of the
(5)    letter, is incorrect.
(6)    Would you agree with that, sir?
(7)        MR. WHITMAN:    Objection to the form.
(8)    A.    The content is correct.
(9)    There is a typo in the date.
(10)    Q.    My question is, the date is incorrect,
(11)    right?
(12)    A.    There is a typo in the date.
(13)    The content is correct.
(14)        MR. LEFKOWITZ:    Would you mark this
(15)    document as Okebiyi Exhibit 10, please.
(16)        (Okebiyi Exhibit 10, four-page letter
(17)    on the stationery of African American
(18)    Planning Commission, Inc., dated June 8,
(19)    2005, to Anjell Bowers, from Matthew
(20)    Okebiyi, Bates stamped Nos. AAPC 00596 and
(21)    AAPC 00599, marked for identification, as of
(22)    this date.)
(23)        BY MR. LEFKOWITZ:
(24)    Q.    I am showing you what has been marked as
(25)    Exhibit 10. It is a four-page document, Bates

Page 149

(1)
(2) numbered AAPC 596 through 599.
(3) On the last page, is that your signature,
(4) sir?
(5)     A.   Yes, it is.
(6)     Q.   Again, would you agree with me that the
(7) date of this letter, June 8th of 2005 – again, we
(8) have a June 2005 date – is incorrect?
(9)     A.   The content is correct.
(10) The date is a typo.
(11)     Q.   The date is incorrect, right?
(12)     A.   The date is a typo.
(13)     Q.   One of the things that displeased you
(14) about Ms. Bowers's performance was you thought she
(15) lacked attention to detail in her writing; isn't that
(16) so?
(17)     A.   No.
(18) It wasn't just that.
(19)     Q.   Well, did you feel that she lacked
(20) attention to detail in her writing?
(21)     A.   Yes.
(22)     Q.   Did you feel that her memos or her
(23) letters or her communications were bad in some way?
(24)     MR. WHITMAN:    Objection to the form.
(25)     A.   Yes, I did.

Page 150

(1)
(2)     Q.   Would you agree that all of these
(3) letters of yours lacked attention to detail?
(4)     A.   In the dates, yes.
(5)     Q.   Would you please pick up Exhibit 3.
(6) Knowing that the actual date, June 22,
(7) 2005, of this document is incorrect, do you have any
(8) recollection as to when you might have sent this
(9) letter?
(10)     A.   No, but I am just curious to see the
(11) original.
(12)     Q.   I'm sorry, your answer is no?
(13)     A.   I said no, to answer your question, but I
(14) am just curious to see the original letter.
(15) MO MR. LEFKOWITZ: I object and move to
(16) strike the last part of that answer as not
(17) responsive.
(18)     MR. WHITMAN:    I object to the motion
(19) to strike.
(20)     Q.   Please pick up Exhibit 4.
(21) Knowing that the date on this letter,
(22) June 7, 2005, is incorrect, do you have any
(23) recollection as to when you actually sent this
(24) letter?
(25)     A.   No, I don't, but I would like to see the

Page 151

(1)
(2) original.
(3)     Q.   When you say you would like to see the
(4) original, are you suggesting that this has been
(5) fraudulently changed, that this date has been whited
(6) out or changed in some way?
(7)     A.   I would just like to see the original.
(8)     Q.   When you send letters as a matter of
(9) business, do you make photocopies before you send
(10) them?
(11)     A.   We give the individual the original copy,
(12) and we keep a copy for our records.
(13)     Q.   So in your records you would have a
(14) photocopy of this letter, wouldn't you, exactly as it
(15) was sent?
(16)     A.   That is correct.
(17)     Q.   There you go. You can go and examine it
(18) to your heart's content.
(19)     MR. WHITMAN:    Objection.
(20) Counsel, the sarcasm is gratuitous and
(21) not necessary.
(22)     MR. LEFKOWITZ:    Well, your client is
(23) suggesting that this is a forgery.
(24)     MR. WHITMAN:    The witness has testified
(25) as a matter of record.

Page 152

(1)
(2) He has not accused anyone of forgery.
(3)     Q.   Would you refer to Exhibit 5, please,
(4) sir.
(5)     A.   Yes.
(6)     Q.   Knowing, as we do now, that the date,
(7) June 8, 2005, of this letter is incorrect, do you
(8) have any guess as to when you actually sent this
(9) letter?
(10)     A.   It was sent in response to her memo.
(11)     Q.   We know that from the content, but I am
(12) asking if you recall when you sent it.
(13)     A.   No, I don't.
(14)     Q.   Would you refer to Exhibit 6, please,
(15) sir.
(16)     A.   Yes.
(17)     Q.   Knowing, as we do, that June 21, 2005 is
(18) not the date that this letter was sent, do you have
(19) any recollection as to when it was sent?
(20)     A.   No, I do not.
(21)     Q.   Exhibit 7 is dated June 7, 2005, but we
(22) know now that it was not sent on that date.
(23) Do you have any recollection as to when
(24) it was actually sent?
(25)     A.   It was sent in response to her memo.

(1)
(2)    Q.    Again, we know from the context that that
(3) is what it was, but it could have been in a day a
(4) week or a month.
(5) Do you have any recollection as to when
(6) it was sent?
(7)    A.    No, I don't. It was in reference to her
(8) memo.
(9)    Q.    Exhibit 8, do you have any recollection
(10) as to when this letter was actually sent?
(11)    A.    No.
(12) It was in reference to her memo.
(13)    Q.    Exhibit 9, again, June 27, 2005 is not
(14) the date that this letter was sent, we have agreed.
(15) Do you have any recollection as to when
(16) it was sent?
(17)    MR. WHITMAN:    Objection to the form.
(18)    A.    No, I do not.
(19) It is in reference to her memo.
(20)    Q.    Exhibit 10, do you have any recollection
(21) as to when this letter was sent, now that we have
(22) agreed that June 8, 2005 is an incorrect date?
(23)    MR. WHITMAN:    Objection to the form.
(24)    A.    No.
(25) It is in reference to her memo.

(1)
(2)    MR. LEFKOWITZ:    Would you mark this
(3) document as Okebiyi Exhibit 11, please.
(4)    (Okebiyi Exhibit 11, two-page
(5) document, each page being a memorandum on
(6) the stationery of African American Planning
(7) Commission, Inc., the first dated April 17,
(8) 2006, to Allison Attles-Bown and others,
(9) from Matthew Okebiyi, the second dated April
(10) 24, 2006, to Child Care/Recreational Staff,
(11) from Gladys B. Pipkins, respectively Bates
(12) stamped Nos. 000038 and 000039, marked for
(13) identification, as of this date.)
(14)    BY MR. LEFKOWITZ:
(15)    Q.    I am showing you now what has been marked
(16) as Exhibit 11, which are two pages Bates stamped 38
(17) and 39.
(18) Sir, have you ever seen these memos
(19) before?
(20)    A.    I don't recall. I may have. I don't
(21) recall.
(22)    Q.    Well, these memos talk about a staff
(23) retreat that happened in April of 2006.
(24) Would you agree with that?
(25)    A.    April 25th to 28th.

(1)
(2)    Q.    A retreat.
(3)    A.    Right.
(4) April 25th to the 28th.
(5)    Q.    That is what these memos talk about.
(6) That is my question.
(7)    A.    Yes.
(8)    Q.    Did you go on that retreat?
(9)    A.    No.
(10)    Q.    Where was the retreat?
(11)    A.    I don't recall.
(12)    Q.    Wasn't it to Disney World?
(13)    A.    I don't recall.
(14)    Q.    Do you remember who went on the retreat?
(15)    A.    No, I do not.
(16)    Q.    What sort of programs or work was done on
(17) the retreat?
(18)    MR. WHITMAN:    Objection to the form.
(19) It calls for speculation.
(20)    A.    I don't recall.
(21)    Q.    Did AAPCI pay for these individuals to go
(22) to Disney World?
(23)    MR. WHITMAN:    Objection; lacks
(24) foundation.
(25)    A.    I don't recall that they went to

(1)
(2) Disney World.
(3)    Q.    How many retreats have there been, to
(4) your knowledge, that AAPCI employees have gone on?
(5)    A.    I don't recall.
(6)    Q.    Is it possible that this is the only
(7) retreat that any employee has ever gone on from
(8) AAPCI?
(9)    A.    I have no idea, sir.
(10)    Q.    Is there anyone at the company who
(11) outranks you?
(12)    A.    My board of directors.
(13)    Q.    Anyone else?
(14)    A.    No.
(15)    Q.    So on a daily basis on the job you are
(16) the top person; isn't that so?
(17)    A.    That is correct.
(18)    Q.    Do you remember making any presentations
(19) or arrangements for any presentations for guest
(20) speakers or programs at this retreat?
(21)    A.    I don't recall.
(22)    Q.    AAPCI is a nonprofit corporation,
(23) correct?
(24)    A.    That is correct.
(25)    Q.    You receive funding from the city?

Page 157

(1)
(2)     A.    That is correct.
(3)     Q.    And the state?
(4)     A.    That is correct.
(5)     Q.    Do you recall where these employees
(6) stayed on this retreat?
(7)     A.    No, I do not.
(8)     Q.    How were the costs for this retreat
(9) entered on AAPCI's books?
(10)     MR. WHITMAN:    Objection to the form.
(11)     A.    I don't recall the retreat, so I
(12) couldn't tell you.
(13)     Q.    Who does AAPCI's books?
(14)     A.    The accountant.
(15)     Q.    That is your brother Raymond; is that
(16) correct?
(17)     A.    That is correct.
(18)     Q.    Does Raymond still work for the company?
(19)     A.    Yes, he does.
(20)     Q.    Where did he work before working for
(21) AAPCI?
(22)     A.    I don't recall.
(23)     Q.    You don't recall?
(24)     A.    No, I don't.
(25)     Q.    How long has he worked for AAPCI?

Page 158

(1)
(2)     A.    My best guess is since we opened.
(3)     Q.    Isn't it true that he left his last job
(4) because he was accused of embezzlement?
(5)     A.    With all due respect, counselor, show it
(6) to me.
(7) I don't know.
(8)     Q.    Sir, I am asking you.
(9)     A.    I don't know.
(10)     Q.    If that is your answer and you don't
(11) know, then that is your answer.
(12) Has your brother ever been arrested?
(13)     A.    No.
(14)     Q.    And you don't know that he was accused of
(15) embezzlement and that is why he left his last job?
(16)     MR. WHITMAN:    Objection; asked and
(17) answered.
(18)     Q.    You can answer.
(19)     A.    My brother has never been arrested or
(20) accused of embezzlement.
(21)     Q.    So now you remember?
(22)     A.    My brother has never been arrested or
(23) accused of embezzlement.
(24)     MR. LEFKOWITZ:    Would you mark this
(25) document as Okebiyi Exhibit 12, please.

Page 159

(1)
(2)     (Okebiyi Exhibit 12, two-page
(3) document, each page being a memorandum on
(4) the stationery of African American Planning
(5) Commission, Inc., the first dated October
(6) 16, 2006, to Gladys Pipkins, from Anjell
(7) Bowers, the second dated October 17, 2006,
(8) to Anjell Bowers, from Gladys B. Pipkins,
(9) respectively Bates stamped Nos. 000106 and
(10) 000107, marked for identification, as of
(11) this date.)
(12)     BY MR. LEFKOWITZ:
(13)     Q.    I show you what has been marked as
(14) Exhibit 12. It's two pages, numbered 106 and 107.
(15) I ask you whether you have ever seen
(16) these documents before.
(17)     MR. WHITMAN:    Is that the question?
(18)     MR. LEFKOWITZ:    Yes.
(19)     Q.    Have you ever seen these before?
(20)     A.    Yes, I have.
(21)     Q.    When is the last time that you saw them?
(22)     A.    I believe these were in Ms. Bowers's
(23) personnel file. I believe that was the last time I
(24) saw them.
(25)     Q.    You believe that these documents were

Page 160

(1)
(2) produced by AAPCI in discovery?
(3)     A.    I don't know how you got them. I believe
(4) they were in the personnel file.
(5)     Q.    What does Ms. Pipkins mean when she talks
(6) about supervision?
(7)     MR. WHITMAN:    Objection.
(8) It calls for speculation.
(9)     Q.    You can answer.
(10)     A.    Supervision is a time when a
(11) subordinate staff member meets with his or her
(12) supervisor to discuss issues. The issues could be
(13) work related, personally related, issues that he or
(14) she may have that are impacting their job
(15) performance, issues that they may have with
(16) subordinate staff, and how to resolve those issues.
(17) It's a time when the subordinate staff
(18) simply meets with his or her supervisor to discuss
(19) issues.
(20)     Q.    Is this something that is regularly
(21) scheduled or that the subordinates' supervisors do on
(22) a regular basis?
(23)     A.    They would arrange it between themselves.
(24)     Q.    What I am asking is, is it something that
(25) is a special circumstance, or is it something that

Page 161

(1)
(2) happens on a regular basis?
(3)   A.   On a regular basis.
(4)   Q.   So it is supervision that does not happen
(5) when something comes up, it's a regular, periodic
(6) thing, where the subordinate and the supervisor get
(7) together to discuss their work?
(8)   A.   Yes.
(9)   Q.   That is fair to say?
(10)   A.   That is fair to say.
(11)   Q.   If you look at the first memo, it's page
(12) 106, Ms. Bowers is requesting her supervision to be
(13) changed from 10:00 in the morning until 2:00 in the
(14) afternoon on Fridays.
(15) Do you see that?
(16)   A.   I see that.
(17)   Q.   So it appears that that is a weekly thing
(18) that they do every week?
(19)   A.   Probably.
(20)   Q.   On the second page, which is numbered
(21) 107, do you see that Ms. Pipkins responds and says
(22) that they are not going to meet for any supervision
(23) until further notice; do you see that?
(24)   MR. WHITMAN:   Objection to the form.
(25)   Q.   Do you see that?

Page 162

(1)
(2)   A.   Yes, I do.
(3)   Q.   Do you know why Ms. Pipkins decided that
(4) she did not need to meet with Ms. Bowers for
(5) supervision anymore?
(6)   MR. WHITMAN:   Objection to the form.
(7)   A.   I can't read her mind. I don't know.
(8)   Q.   There is nothing that sticks out for you
(9) from October of 2006 that would cause you to think
(10) that she meant one thing or another?
(11)   A.   I can't read her mind. I don't know.
(12)   Q.   Is there an employee at AAPCI named
(13) Ms. Alston?
(14)   A.   Yes, there is.
(15)   Q.   Does she currently remain an employee, or
(16) is she a former employee?
(17)   A.   Ms. Alston is a current employee.
(18)   Q.   What is her first name?
(19)   A.   Tammy.
(20)   Q.   Tammy?
(21)   A.   Yes.
(22)   Q.   Have you ever discussed Ms. Bowers with
(23) Ms. Alston?
(24)   A.   Me personally?
(25)   Q.   Yes.

Page 163

(1)
(2)   A.   No.
(3)   Q.   Did you ever ask Ms. Alston to write a
(4) memo or write up Ms. Bowers for doing something
(5) wrong?
(6)   A.   Not that I can recollect.
(7)   Q.   Have you ever been accused, before this
(8) lawsuit, of sexual harassment?
(9)   A.   No, I have not.
(10)   Q.   Have you ever had a romantic involvement
(11) or a sexual relationship with a coworker?
(12)   A.   No, I have not.
(13)   Q.   I'm not only talking about at AAPCI. I
(14) am talking about at your other jobs as well.
(15) I want to make sure that that is clear.
(16) Have you ever had a romantic involvement
(17) or a sexual relationship with a coworker?
(18)   A.   No.
(19)   Q.   Have you ever made a pass at a coworker
(20) at AAPCI?
(21)   A.   No, I have not.
(22)   Q.   Do you understand what I mean by "make a
(23) pass at"?
(24)   A.   Yes, sir.
(25)   Q.   What, in your mind, does it mean when I

Page 164

(1)
(2) say, "make a pass at"?
(3)   A.   Try and go out on a date. Look at the
(4) person in a luring manner of sorts.
(5) That is my interpretation of what you are
(6) trying to say.
(7)   Q.   Fair enough. I will accept your
(8) explanation because that is what I mean as well when
(9) I say that.
(10) When I talk about a romantic involvement
(11) or a sexual relationship, you understand that I am
(12) including making a pass within that description; do
(13) you understand that?
(14)   A.   Yes, I do.
(15)   Q.   When I talk about a romantic involvement
(16) or a sexual relationship, it includes acts other than
(17) sexual intercourse.
(18) Do you understand what I mean when I talk
(19) about that?
(20)   A.   Yes, I do.
(21)   Q.   Who is Shelly Styles?
(22)   A.   Ms. Styles was a former employee of
(23) AAPCI, Serenity House.
(24)   Q.   When is the last time you spoke to her?
(25)   MR. WHITMAN:   Objection to the form.

## Page 165

(1)
(2)    A.   I believe it was several weeks ago.
(3)    Q.   How long ago did Ms. Styles stop
(4) working at AAPCI?
(5)    A.   I don't recall.
(6)    Q.   Was it several weeks ago or longer ago
(7) than that?
(8)    A.   Longer.
(9)    Q.   Was it several months ago or longer ago
(10) than that that she stopped working at AAPCI?
(11)    A.   Longer, I believe.
(12)    Q.   It is more than a year since Ms. Styles
(13) has worked at AAPCI?
(14)    A.   Yes.
(15)    Q.   Longer than two years?
(16)    A.   I am going to guess and say yes.
(17)    Q.   So that would be about the range of your
(18) recollection, about two years? If I asked you three
(19) years, you would say that you don't know?
(20)    A.   Correct.
(21)    Q.   What occasioned you to speak with
(22) Ms. Styles about a week ago?
(23)    A.   If I recollect, there are certain
(24) individuals that Ms. Styles calls every now and then
(25) to find out how the recreation department is going,

## Page 166

(1)
(2) how Serenity House is doing.
(3) We talk once in a blue moon, just to find
(4) out how Serenity is doing, and the other projects we
(5) are working on.
(6)    Q.   When you say that you spoke to her about
(7) a week ago, it was she that called and not the other
(8) way around?
(9)    A.   That is correct.
(10)    Q.   Where does Ms. Styles live?
(11)    A.   In the South.
(12)    Q.   When you say, "in the South," you are
(13) talking about outside of New York State, in the South
(14) of the United States?
(15)    A.   That is correct.
(16)    Q.   How long has she lived there?
(17)    A.   I have no idea.
(18)    Q.   Have you ever had a romantic or a sexual
(19) relationship with Ms. Styles?
(20)    A.   No.
(21)    Q.   Has she ever lived with you?
(22)    A.   No.
(23)    Q.   Has she ever come to stay with you for a
(24) brief period?
(25)    A.   No.

## Page 167

(1)
(2)    Q.   So if she said that you and her did have
(3) that kind of relationship, that would be a lie?
(4)    A.   That is correct.
(5)    Q.   Who is Tiesha Salmon?
(6)    A.   A former employee.
(7)    Q.   A former employee of AAPCI?
(8)    A.   Yes.
(9)    Q.   When did she stop working at AAPCI?
(10)    A.   I don't recollect when.
(11)    Q.   More than a year ago?
(12)    A.   Yes.
(13)    Q.   When is the last time you spoke with
(14) Ms. Solomon?
(15)    A.   The last time I spoke to Ms. Solomon was,
(16) I want to say, several years ago. I was driving down
(17) the street. I saw her crossing. I waved hi and I
(18) kept on going.
(19)    Q.   Going back to Ms. Styles for a minute,
(20) you know she lives in the South somewhere; is that
(21) correct?
(22)    A.   That is correct.
(23)    Q.   Do you know where she works?
(24)    A.   No, I don't.
(25)    Q.   Do you know what she does for a living?

## Page 168

(1)
(2)    A.   No, I don't.
(3)    Q.   When is it that you said you ran into
(4) Ms. Solomon on the street and waived hi; when did you
(5) say that was?
(6)    A.   I said it was some time ago. I don't
(7) remember when.
(8)    Q.   Quite a while ago?
(9)    A.   Yes.
(10)    Q.   Is that the last time that you had any
(11) contact with her?
(12)    A.   Seeing her?
(13)    Q.   Any contact whatsoever with Ms. Solomon.
(14)    A.   Yes.
(15)    Q.   That time you saw her on the street and
(16) you waived hi?
(17)    A.   That is correct.
(18)    Q.   Since then you have not spoken to her,
(19) seen her, heard from her in any way?
(20)    A.   That is correct.
(21)    Q.   If Ms. Solomon said that she had known
(22) about a relationship that you had with Ms. Styles,
(23) would Ms. Solomon be lying as well?
(24)    A.   That is correct.
(25)    Q.   Was there ever a time when -- this is

(1)
(2) when Ms. Styles still worked for the company – you
(3) zipped up her blouse and explained to the people
(4) around that you did not want the other men to be
(5) jealous of what you had?
(6)    A.    What was the question?
(7)    Q.    Was there ever a time while Ms. Styles
(8) was still working for the company when you zipped up
(9) her blouse so she revealed less, and you explained
(10) that you did not want the other men to be jealous of
(11) what you had?
(12)    A.    No.
(13)    Q.    If there are witnesses who saw that and
(14) testified to that, they would be lying as well?
(15)    A.    There would be no witnesses.
(16)    Q.    Have you ever asked a coworker out on a
(17) date?
(18)    A.    No, I have not.
(19)    Q.    Have you ever made sexual or romantic
(20) advances towards a client or a resident of AAPCI?
(21)    A.    No, I have not.
(22)    Q.    Have you ever had sexual relations with a
(23) client or a resident of AAPCI?
(24)    A.    No, I have not.
(25)    Q.    Are you aware of any complaints lodged

(1)
(2) against you by clients or residents that you made
(3) romantic advances or passes towards them?
(4)    A.    That I am aware of?
(5) I don't understand the question.
(6)    Q.    You can only testify to what you are
(7) aware of.
(8) If you are not aware of it, you don't
(9) know about it.
(10) I am asking you, are you aware of any
(11) complaints lodged against you by clients or residents
(12) that you made romantic advances or passes towards
(13) them?
(14)    A.    No.
(15)    Q.    Do you recall a client or a resident of
(16) AAPCI named Ms. Barnes?
(17)    A.    Yes.
(18)    Q.    What is Ms. Barnes's first name?
(19)    A.    I don't recall.
(20)    Q.    Have you had any romantic or sexual
(21) involvement with her?
(22)    A.    No.
(23)    Q.    I am going to show you what has
(24) previously been marked as Bowers Exhibit 21, which is
(25) the complaint in this case.

(1)
(2)    Have you ever read this document before,
(3) sir?
(4)    A.    Yes, I have.
(5)    Q.    When is the last time that you read it?
(6)    A.    Months ago. I don't remember exactly
(7) when.
(8)    Q.    If you would turn to paragraph 10, it's
(9) on page 3, there is an allegation there that says,
(10) "Plaintiff mispronounced his name, and he responded
(11) in a suggestive manner that plaintiff 'could call him
(12) anything she wants.'"
(13) Do you recall this incident or anything
(14) similar to this happening when you met one of your
(15) first times with Ms. Bowers, when she first began
(16) working at AAPCI?
(17)    A.    It never happened.
(18)    Q.    Your testimony is that the allegations in
(19) paragraph 10 of the complaint never happened?
(20)    A.    That is correct.
(21)    Q.    Did anything similar to that happen?
(22)    A.    No.
(23)    Q.    Would you look at paragraph 12.
(24) Did you ever ask Ms. Bowers to go to
(25) lunch with you?

(1)
(2)    A.    No.
(3)    Q.    Never at all, ever?
(4)    A.    Never.
(5)    Q.    Even as just a welcoming gesture, a boss
(6) to a new employee, a get to know you kind of lunch;
(7) you never asked her out to lunch?
(8)    A.    No.
(9)    Q.    So your testimony is that the allegations
(10) in paragraph 12 are all false?
(11)    A.    That is correct.
(12)    Q.    As would be the allegations in
(13) paragraph 13, correct?
(14)    A.    That is correct.
(15)    Q.    In paragraph 14 Ms. Bowers describes an
(16) incident when she was standing at the copy machine
(17) making copies, and you approached her from behind,
(18) and held her around her waist with both of your
(19) hands.
(20) Do you recall that happening?
(21)    A.    It never happened.
(22)    Q.    Have you ever touched Ms. Bowers?
(23)    A.    I have never touched her.
(24)    Q.    You never touched her on the shoulder, or
(25) on the hip?

## Page 173

(1)
(2)    A.   I never touched Ms. Bowers.
(3)    Q.   So your testimony is that the contents of
(4) paragraph 14 are all false?
(5)    A.   That is correct.
(6)    Q.   Did anything like that ever happen in a
(7) different way than it's explained here, an incident
(8) where you had a conversation with her at a copy
(9) machine, or an argument with her at a copy machine,
(10) or anything like that?
(11)    MR. WHITMAN:    Objection to the form.
(12)    Q.   You can answer.
(13)    A.   No.
(14)    Q.   Now looking at paragraph 15, did you ever
(15) tell the plaintiff that she didn't need to drink a
(16) Slim-Fast because she looked fine, or words to that
(17) effect?
(18)    A.   No, I did not.
(19)    Q.   Did you ever have a casual conversation
(20) with Ms. Bowers in the workplace?
(21)    MR. WHITMAN:    Objection to the form.
(22)    A.   "How is work going," that type of
(23) conversation, yes.
(24)    Q.   Did you ever discuss any personal issues
(25) with her?

## Page 174

(1)
(2)    A.   Never.
(3)    Q.   Did she try to talk about personal issues
(4) with you, or did it just never happen either way?
(5)    A.   It never happened either way.
(6)    Q.   So you never shot the breeze about any
(7) personal matter?
(8)    A.   No, sir.
(9)    Q.   If you would look at paragraph 18,
(10) Ms. Bowers describes an incident where she came into
(11) your office.
(12) Do you see that?
(13)    A.   Yes, I do.
(14)    Q.   Have you read that allegation?
(15)    A.   Yes, I have.
(16)    Q.   Did anything like that ever happen?
(17)    A.   No, sir.
(18)    Q.   Did you have an ex-girlfriend that
(19) cheated on you in or around August of 2005?
(20)    A.   No, sir.
(21)    Q.   Did you have any relationship that ended
(22) with a woman in or about August of 2005?
(23)    A.   No, sir.
(24)    Q.   In paragraph 20 Ms. Bowers describes a
(25) trip to purchase work supplies.

## Page 175

(1)
(2) Do you see that?
(3)    A.   Yes, I do.
(4)    Q.   Did anything like that ever happen?
(5)    MR. WHITMAN:    Objection to the form.
(6)    A.   No, sir.
(7)    Q.   Did you ever drive with Ms. Bowers
(8) anywhere to pick up anything for AAPCI?
(9)    A.   Yes, I did.
(10)    Q.   How many times would you say that you did
(11) that?
(12)    A.   One time.
(13)    Q.   Where did you go?
(14)    A.   Costco.
(15)    Q.   Do you remember when that was?
(16)    A.   I don't remember the date.
(17)    Q.   Ms. Bowers suggests in her complaint that
(18) it was January of 2006.
(19) Does that sound correct to you?
(20)    A.   There is another way to definitively find
(21) out.
(22)    Q.   I am just asking if you remember, sir.
(23)    A.   I don't remember.
(24)    Q.   Had Ms. Bowers ever accompanied you to
(25) Costco before that time?

## Page 176

(1)
(2)    A.   No.
(3)    Q.   How did it come about that Ms. Bowers
(4) went with you to Costco on that occasion?
(5)    A.   I always did the shopping. I went to
(6) Costco by myself. I came back with supplies.
(7) Ms. Bowers informed me that I bought the wrong mixed
(8) vegetables.
(9) I informed everyone in child care that
(10) the next time I go shopping with a list, somebody is
(11) going to come with me.
(12) Everybody raised their hands -- I had
(13) asked for volunteers -- including Ms. Bowers, and
(14) that is how she got to go.
(15)    Q.   You are saying that Ms. Bowers
(16) volunteered to go with you?
(17)    A.   Yes, I am.
(18)    Q.   You asked for volunteers, everybody
(19) raised their hands, and Ms. Bowers was one of the
(20) people that raised their hands?
(21)    A.   That is correct.
(22)    Q.   And you chose Ms. Bowers to go with you?
(23)    A.   I didn't.
(24)    Q.   How did it come about that Ms. Bowers is
(25) the one that went?

Page 177

(1)
(2)  A.  She responded, "I am the supervisor and
(3)  my authority supersedes everyone else's."
(4)  Q.  So she said, essentially, she is the boss
(5)  of her department, if she wants to go, she is going
(6)  to go?
(7)  A.  That is correct.
(8)  Q.  How did you get to Costco?
(9)  A.  We drove.
(10)  Q.  Who drove?
(11)  A.  I did.
(12)  Q.  In your car?
(13)  A.  Yes, sir.
(14)  Q.  Which Costco did you go to?
(15)  A.  The Costco on Third Avenue in Brooklyn.
(16)  Q.  Underneath the BQE there?
(17)  A.  That is correct.
(18)  Q.  How long did it take to get there?
(19)  A.  I want to say between 45 minutes to an
(20)  hour, depending on traffic, around that time.
(21)  Q.  Do you recall there being traffic on that
(22)  occasion?
(23)  A.  During that time, on Atlantic Avenue,
(24)  yes, there is always traffic during the time we went.
(25)  Q.  In her complaint Ms. Bowers talks about

Page 178

(1)
(2)  your playing the same love song on the CD player
(3)  continuously.
(4)  Do you see that?
(5)  A.  Yes, I do.
(6)  Q.  Did anything like that happen?
(7)  A.  No, sir.
(8)  Q.  You deny that entirely?
(9)  A.  Entirely.
(10)  Q.  Did you listen to the radio at all in the
(11)  car on the way to Costco with Ms. Bowers?
(12)  A.  No.
(13)  Q.  Did you and Ms. Bowers talk?
(14)  A.  Yes, we did.
(15)  Q.  What did you talk about?
(16)  A.  Child care.
(17)  Q.  Only work?
(18)  A.  Only work.
(19)  Q.  No personal matters at all?
(20)  A.  None at all.
(21)  Q.  You already testified that you never
(22)  spoke with Ms. Bowers about any personal matters;
(23)  isn't that so?
(24)  A.  That is correct.
(25)  Q.  What about child care did you talk about

Page 179

(1)
(2)  with her?
(3)  A.  The food supplies, how to run the
(4)  department better.
(5)  That's about it.
(6)  Q.  What happened when you got to Costco?
(7)  A.  We went to Costco, did the shopping, and
(8)  we came back.
(9)  Q.  Were there any problems or disagreements
(10)  between you and Ms. Bowers while you did the
(11)  shopping?
(12)  A.  Yes.
(13)  Q.  What were they?
(14)  A.  Certain items on the list she – certain
(15)  items that were not on the list she wanted to
(16)  purchase.
(17)  Q.  Was that the extent of the problems or
(18)  issues that you had?
(19)  A.  Pretty much.
(20)  Q.  How was that resolved?
(21)  A.  I didn't purchase them.
(22)  Q.  Was that at your doing or were you
(23)  acceding to her request?
(24)  MR. WHITMAN:  Objection to the form.
(25)  A.  Say that again.

Page 180

(1)
(2)  MR. LEFKOWITZ:  Withdrawn.
(3)  Q.  On the return trip by car, did you stop
(4)  anywhere?
(5)  A.  Probably a mile from the job, as I
(6)  recall, a place called – a pizza shop.
(7)  Q.  You stopped off for some pizza?
(8)  A.  A slice, yes.
(9)  Q.  Did you both eat?
(10)  A.  I don't recall.
(11)  I think it was just for me.
(12)  Q.  Did you stay in the pizzeria and eat your
(13)  slice, or did you take it to go, or eat it in the
(14)  car?
(15)  A.  To go.
(16)  Q.  Did you eat it in the car, or did you
(17)  wait until you got back to the office?
(18)  A.  I don't remember.
(19)  Q.  If you look at paragraph 24 of the
(20)  complaint, Ms. Bowers talks about an instance where
(21)  she was going to lunch with another employee,
(22)  Ms. Billie.
(23)  Do you see that?
(24)  A.  Yes, I do.
(25)  Q.  Do you remember anything like that ever

## Page 181

(1)
(2) happening?
(3)     A.    No, sir.
(4)     Q.    There was never a circumstance when you
(5) saw them leaving, and ran to catch up with them, and
(6) questioned them about why they were going to lunch,
(7) or anything about that?
(8)     A.    No.
(9) I saw them go out to lunch. I did not
(10) chase them, confront them, ask them where they were
(11) going. I really couldn't care less where they were
(12) going.
(13)     Q.    So your testimony, then, is that
(14) paragraph 24 of the complaint is a complete
(15) falsehood?
(16)     A.    Correct.
(17)     MR. LEFKOWITZ:    Subject to rulings on the
(18) improper objections and questions regarding
(19) documents which were requested, I have no
(20) further questions at this time.
(21)     MR. WHITMAN:    Subject to my disagreement
(22) with counsel's characterization of the
(23) instruction, which, obviously, I do not
(24) believe was improper, I have no questions.
(25)     MR. LEFKOWITZ:    Off the record.

## Page 182

(1)
(2)     (Discussion off the record.)
(3)     (Time noted: 2:50 p.m.)
(4)
(5)
(6)     MATTHEW OKEBIYI
(7)
(8) Subscribed and sworn to before me
(9) this day of , 2010.
(10)
(11)
(12) (Notary Public) My Commission Expires:
(13)
(14)
(15)
(16)
(17)
(18)
(19)
(20)
(21)
(22)
(23)
(24)
(25)

## Page 183

(1)
(2)     C E R T I F I C A T E
(3) STATE OF NEW YORK )
(4)     : ss.
(5) COUNTY OF NEW YORK )
(6) I, SUSAN B. RATNER, a Shorthand Reporter
(7) and a Notary Public within and for the State of
(8) New York, do hereby certify that the foregoing
(9) deposition of MATTHEW OKEBIYI was taken before me on
(10) the 9th day of April, 2010;
(11)     That the said witness was duly sworn
(12) before the commencement of his testimony; that the
(13) said testimony was taken stenographically by me and
(14) then transcribed.
(15) I further certify that I am not related
(16) by blood or marriage to any of the parties to this
(17) action or interested directly or indirectly in the
(18) matter in controversy; nor am I in the employ of any
(19) of the counsel in this action.
(20) IN WITNESS WHEREOF, I have hereunto set
(21) my hand this 21st day of April, 2010.
(22)
(23)
(24)     SUSAN B. RATNER
(25)

## Page 184

(1)
(2) April 9, 2010
(3) I N D E X
(4) WITNESS EXAMINATION BY PAGE
(5) MATTHEW OKEBIYI MR. LEFKOWITZ 4-182
(6)
(7)     DIRECTIONS (DI):    15, 29
(8)     RULINGS (RL):    17, 29
(9)     REQUESTS (RQ):    41, 119, 135, 140
(10)     MOTIONS (MO):    18, 150
(11)
(12) E X H I B I T S
(13) OKEBIYI # FOR IDENT.
(14) 1 - Two-page document headed "Serenity House
(15) Family Residence, A Project of the African
(16) American Planning Commission, Job
(17) Description," re: child/recreational care
(18) supervisor, Bates stamped Nos. AAPC 00079
(19) and AAPC 00080............................ 132
(20) 2 - One-page memorandum on the stationery of
(21) African American Planning Commission, Inc.,
(22) dated May 10, 2006, to Anjell Bowers, from
(23) Gladys B. Pipkins, Bates stamped No. 000211. 134
(24)
(25)

Page 185

(1)
(2) April 9, 2010
(3) E X H I B I T S
(4) OKEBIYI # FOR IDENT.
(5) 3 - Two-page letter on the stationery of
(6) African American Planning Commission, Inc.,
(7) dated June 22, 2005, to Anjell Bowers, from
(8) Matthew Okebiyi, Bates stamped Nos. 000326 and
(9) 000327..................................... 137
(10) 4 - One-page letter on the stationery of
(11) African American Planning Commission, Inc.,
(12) dated June 7, 2005, to Anjell Bowers, from
(13) Matthew Okebiyi, Bates stamped No. 000342... 140
(14) 5 - Two-page letter on the stationery of
(15) African American Planning Commission, Inc.,
(16) dated June 8, 2005, to Anjell Bowers, from
(17) Matthew Okebiyi, Bates stamped Nos. 000045
(18) and 000046................................. 142
(19) 6 - One-page letter on the stationery of
(20) African American Planning Commission, Inc.,
(21) dated June 21, 2005, to Anjell Bowers, from
(22) Matthew Okebiyi, Bates stamped Nos. 000052.. 143
(23)
(24)
(25)

Page 187

(1)
(2) April 9, 2010
(3) E X H I B I T S
(4) OKEBIYI # FOR IDENT.
(5) 11 - Two-page document, each page being a
(6) memorandum on the stationery of African
(7) American Planning Commission, Inc., the
(8) first dated April 17, 2006, to Allison
(9) Attles-Bown and others, from Matthew Okebiyi,
(10) the second dated April 24, 2006, to Child
(11) Care/Recreational Staff, from Gladys B. Pipkins,
(12) respectively Bates stamped Nos. 000038 and
(13) 000039..................................... 154
(14) 12 - Two-page document, each page being a
(15) memorandum on the stationery of African
(16) American Planning Commission, Inc., the first
(17) dated October 16, 2006, to Gladys Pipkins,
(18) from Anjell Bowers, the second dated October 17,
(19) 2006, to Anjell Bowers, from Gladys B. Pipkins,
(20) respectively Bates stamped Nos. 000106 and
(21) 000107..................................... 159
(22)
(23)
(24)
(25)

Page 186

(1)
(2) April 9, 2010
(3) E X H I B I T S
(4) OKEBIYI # FOR IDENT.
(5) 7 - Two-page letter on the stationery of
(6) African American Planning Commission, Inc.,
(7) dated June 7, 2005, to Anjell Bowers, from
(8) Matthew Okebiyi, Bates stamped No. 000058... 144
(9) 8 - One-page letter on the stationery of
(10) African American Planning Commission, Inc.,
(11) dated June 8, 2005, to Anjell Bowers, from
(12) Matthew Okebiyi, Bates stamped No. 00084.... 146
(13) 9 - One-page letter on the stationery of
(14) African American Planning Commission, Inc.,
(15) dated June 27, 2005, to Anjell Bowers, from
(16) Matthew Okebiyi, Bates stamped No. 000145... 147
(17) 10 - Four-page letter on the stationery of
(18) African American Planning Commission, Inc.,
(19) dated June 8, 2005, to Anjell Bowers, from
(20) Matthew Okebiyi, Bates stamped Nos. AAPC 00596
(21) through AAPC 00599.......................... 148
(22)
(23)
(24)
(25)